| | | |
|---|---|---|
| **NEW ORLEANS CITY** | * | **CIVIL ACTION** |
| | * | |
| **VERSUS** | * | **NO. 09-151** |
| | * | |
| **BELLSOUTH TELECOMMUNICATIONS, INC.** | * | **SECTION "L"(5)** |

## <u>ORDER & REASONS</u>

Before the Court are the following motions filed in the above captioned matter:

(1)     Defendant BellSouth Telecommunications, Inc.'s ("BellSouth") Motion for Partial Summary Judgment on Claims in the Original Complaint (Rec. Doc. No. 47);

(2)     BellSouth's Motion for Partial Summary Judgment on Plaintiff City of New Orleans' First Amended Complaint (Rec. Doc. No. 49);

(3)     BellSouth's Motion to Exclude Testimony of Plaintiff's Expert Dr. Bryce Ward (Rec. Doc. No. 48);

 (4)     Plaintiff City of New Orleans' ("City") Motion for Summary Judgment (Rec. Doc. No. 50).

The Court received briefing on these Motions and heard from the parties on oral argument.  The Court now rules on these Motions as follows.

## I.     BACKGROUND

This case arises out of the alleged failure on the part of BellSouth to compensate the City under certain ordinances, agreements, and law, for BellSouth's use of the City's rights-of-way since 2007 to provide telecommunications services to its customers.  New Orleans City Council ("Council") intervened in the action as the party governing the issuance of franchise ordinances

and rights-of-way.  This case stems from a lengthy history of agreements and disputes between the parties which is discussed as follows.

In 1879, the Council issued ordinance No. 4906 adopting an agreement entered into by the City and BellSouth[1] which authorized BellSouth to provide telephone service in New Orleans ("1879 Franchise Ordinance").  *See* Def.'s Ex. 1.  Specifically, the 1879 Franchise Ordinance provides that BellSouth is authorized,

> [T]o construct and maintain a line or lines of telegraphs through the streets of this city, the line or lines to be constructed along such streets, at such points and in such manner as to the kind and position of the telegraph poles, the height of the wires above the streets, and in all other particulars, as the Administrator of the Department of Improvements of this city may direct; provided, however, that the said company shall connect their wires with the Mayor's office, chief of police office and fire alarm telegraph office, and place and keep telephones therein, free of charge to the city, so that the said telephones may be used in connection with all wires under the control of said company.  *See id.*

The Ordinance further provides "all the acts and doings of said company under this ordinance shall be subject to any ordinance or ordinances that may hereafter be passed by the City Council."  *See id.*

Thereafter, in 1880, the Louisiana legislature passed Act 124 which granted corporations formed "for the purpose of transmitting intelligence by magnetic telegraph or telephone or other system of transmitting intelligence, the equivalent thereof which may be hereafter invented or discovered" to "construct maintain such telegraph, telephone or other lines necessary to transmit intelligence along all State, parish or public roads or public works."  *See* Def.'s Ex. 2.  Act 124 permitted these lines "along the streets of any city, with the consent of the council or trustees thereof."  *See id*.

---

[1]At this time BellSouth was operating under the name of its predecessor, the New Orleans Telephonic Exchange.

Then, in 1883, the Council passed an ordinance requiring BellSouth[2] to pay a fee to maintain or erect telephone poles in a certain area within in New Orleans. BellSouth did not pay the required fees, and the City sued to enjoin BellSouth from using these poles to transmit telephone and telegraph services until payment was rendered. This case reached the Louisiana Supreme Court in *City of New Orleans v. Great Southern Telephone & Telegraph Co.*, 3 So. 533 (La. 1888)("*Great Southern*"). The Court, relying upon the language of the 1879 Franchise Ordinance and Act 124, concluded that BellSouth and the City had entered into "an irrevocable contract" which "the city is powerless to set [] aside or to interpolate new or more onerous considerations therein." *Great Southern*, 3 So. at 535. The Court further concluded that the 1879 Franchise Ordinance remained in "full force and effect" and did not grant the Council or the City "power to repeal, destroy, or alter it in any of its essential features and considerations" through subsequent ordinances. *Id*. Accordingly, BellSouth was thereafter permitted to erect and maintain its telephone poles free of charge within New Orleans.

In 1906, in response to an inquiry of the Council as to whether BellSouth[3] would be willing to pay the City a sum per annum for its use of the City's streets, BellSouth submitted an offer in writing to the Council indicating its willingness to do so under certain circumstances. *See* Def.'s Ex. 3. BellSouth stated that, in consideration of the great benefit it has received under the 1879 Franchise Ordinance, it would pay to the City "three (3) per cent of its gross receipts from rentals paid by telephone subscribers for rental of telephones in the City of New Orleans,

---

[2]At this time BellSouth was operating under the name of its predecessor, Great Southern Telephone & Telegraph Company.

[3]At this time BellSouth was operating under the name of its predecessor, Cumberland Telephone & Telegraph Company Incorporated.

3

so long as [BellSouth] is alone operating in the city." *See id.* BellSouth clarified that this sum could not and would not be for its current rights granted under the 1879 Franchise Ordinance. *See id.* The Council moved to accept BellSouth's offer to pay the City three percent of its gross receipts of rentals, but denied BellSouth's request that the City grant no other privileges for the use of streets in connection with the telephone business ("1906 Agreement"). *See id.*

In 1916, BellSouth sent a letter to the Commissioner of Public Property confirming a prior conversation between these parties, the Mayor and a judge, during which BellSouth agreed "to furnish the City telephone service at the rates fixed by the Louisiana Railroad Commission less thirty three and one-third per cent discount" ("1916 Agreement"). *See* Def.'s Ex. 4. The letter also provided, "[i]n addition to the three free telephones which [BellSouth] furnishes to the City under its franchise obligation, [BellSouth] agrees to give the City of New Orleans twenty-five additional telephones, free of charge." *See id.*

In 1960, the City and BellSouth[4] entered into a settlement agreement to resolve a pending lawsuit ("1960 Settlement Agreement"). *See* Def.'s Ex. 6, ¶ 1.4. Pursuant to this agreement, BellSouth agreed to pay a lump sum of $1,250,000.00 plus 2% of each the gross receipts from basic telephone rentals, gross basic charges for teletypwriter local service, and gross basic charges for local private line services. *See id.*

In 1984, in conjunction with negotiations regarding the effects of divestiture[5] as it related

---

[4]During this time, BellSouth was operating under the name of its predecessor, Southern Bell Telephone & Telegraph.

[5]Presumably the "divestiture" is a reference to a 1982 settlement agreement under which AT&T's Bell System agreed to divest its local exchange service operating companies in exchange for the right to go into the computer business. Thereafter, AT&T's local operations were split into regional holding companies.

4

to the 1916 Agreement, BellSouth[6] submitted a written proposal to the City for approval ("1984 Concession Agreement"). *See* Def.'s Ex. 5. The proposal by BellSouth provided for a lump sum payment of $417,285.18 in exchange for the equipment portion of the concession in the 1916 Agreement, and a cap of $31,407.21 monthly for the lines and service portion of the 1916 Agreement. *See id.* The 1984 Concession Agreement also provided that its terms would affect only the terms of the 1916 Agreement and no other obligations or rights between the parties. *See id.*

In 1993, the City and BellSouth entered into a settlement agreement to resolve certain disputes arising from the number of previous agreements and ordinances, most of which are discussed above ("1993 Settlement Agreement"). *See* Def.'s Ex. 6. In this agreement, BellSouth agreed to pay a $4,950,000.00 lump sum to the City, representing the payments required under the 2% provisions of the 1960 Settlement Agreement. *See id.* Additionally, this agreement recognized the validity of the 1906 Agreement and the obligation of BellSouth to continue its payments thereunder. *See id.*

In 1996, the Council issued an Ordinance of General Applicability ("OGA") which enacted the Wireline Telecommunications Franchise Act for the occupancy of the City's rights-of-way for the purpose of communicating data, information, intelligence, signals, voice, and/or video. *See* Def.'s Ex. 7. The OGA provides uniform procedures for the occupancy, installation, maintenance, repair, and/or operation of wireline telecommunications and wireless communication systems in the public rights-of-way of the City, and the establishment of fair

---

[6]At this time, BellSouth was operating under the name of its predecessor, South Central Bell.

consideration or competition to be paid by providers of these systems. *See id.* The OGA further provides that companies operating pursuant to pre-existing franchises "shall remain subject to all existing provisions of such," but also provides that if these franchises are renewed, they will be governed by the OGA. *See id.* Additionally, the OGA provides for a specific method of compensation for "existing Franchises and permits and privileges which are subject to an Ordinance of General Application." *See id.*

In 1998, the parties entered into a settlement agreement which directed BellSouth to pay $2.5 million to the City for outstanding payments under the provision of the 1906 Agreement requiring BellSouth to pay 3% of gross receipts from telephone rentals ("1998 Settlement Agreement"). *See* Def.'s Ex. 8.

In 2000, the City sued BellSouth for failure to pay the City the full amounts due under the 1906 Agreement. In 2001, the City and BellSouth entered into a settlement agreement ("2001 Settlement Agreement") resolving this dispute. *See* Def.'s Ex. 9. The 2001 Settlement Agreement recognized the validity of the 1879 Franchise Ordinance as upheld by the Louisiana Supreme Court in *Great Southern*, and provided that the City is not entitled to seek additional compensation or consideration from BellSouth for the rights conferred thereunder. *See id.* The Agreement further provided that because "other persons or companies have acquired the right to conduct a telephone exchange or business in the City, the 1906 Agreement has terminated." *Id*. Furthermore, the 2001 Settlement Agreement required BellSouth to pay $5,500,000.00 annually for six years, from 2001 to 2006, in lieu of the payments pursuant to the 1906 Agreement. *See id.* The 2001 Settlement Agreement released and discharged the parties from "all claims, actions, causes of action, and disputes whether known or unknown, asserted or unasserted, that

in any way concern the 1879 Ordinance, the 1906 Agreement, or the [1984] Concession Agreement." *Id*. As further consideration for the 2001 Settlement Agreement, the Mayor of New Orleans at the time, Marc Morial, agreed to publicly support and act towards the passage of simplified tax legislation. *See id.* Also as further consideration, the parties agreed that if Louisiana does not enact the simplified tax legislation before January 2007, the City may by ordinance elect to enter the Louisiana Municipal Association ("LMA") Agreement for five years, with the possibility of extending this agreement if certain conditions are met. *See id.* The Council issued an Ordinance adopting and ratifying the 2001 Settlement Agreement. *See* Def.'s Ex. 10. The simplified tax legislation was not passed by January 2007 nor did the City issue an ordinance entering the LMA agreement.

On January 20, 2009, the City filed suit against BellSouth for damages allegedly owed to the City based upon the foregoing agreements, ordinances, and federal telecommunications law for BellSouth's use of the City's rights-of-way. Specifically, the suit seeks compensation from BellSouth for the use of the City's rights-of-way since 2007 and a determination of how this compensation will be calculated and governed. The City also seeks declaratory relief to establish the following: (1) the 1879 Franchise Ordinance bas been breached by BellSouth, and thus the City may terminate this Ordinance, (2) the 1984 Concession Agreement is null and void, and (3) the OGA is applicable to BellSouth's use of the City's rights-of-way and BellSouth is liable for all sums due to the City pursuant to the OGA. Alternatively, the City asks that BellSouth be ordered to enter into an LMA Agreement with the City.

BellSouth filed an answer denying that it owes any outstanding compensation to the City and raising a number of affirmative defenses.

The Council filed a Complaint in Intervention essentially adopting the City's Complaint and requesting a declaration from the Court that the Council is the exclusive franchise authority in New Orleans.

The City subsequently filed a First Amended Complaint, alleging that BellSouth has constructed boxes that would allow it to distribute video and television content to its customers ("U-Verse") without obtaining a proper amendment to its franchise. The City seeks an injunction preventing BellSouth from offering U-Verse to its customers and from building or maintaining the U-Verse transmission equipment. BellSouth has answered and refutes the City's allegation that it is currently working towards providing U-Verse services to customers in New Orleans.

BellSouth filed a Second Supplemental and Amended Answer and Counterclaim against the City. The Counterclaim seeks to require the City to reimburse BellSouth for all amounts paid by BellSouth to the City under Section 3.3 of the 2001 Settlement Agreement in case the Court concludes that this Agreement is invalid. If this does occur, BellSouth additionally requests that the Court re-open the claims made in the 2000 litigation so as to allow BellSouth to seek reimbursement for all amounts paid to the City pursuant to the 1906 Letter Agreement.

The Court will now address the following motions filed by the parties: BellSouth's Motion for Partial Summary Judgment on Claims in the Original Complaint (Rec. Doc. No. 47), BellSouth's Motion for Partial Summary Judgment on Plaintiff City of New Orleans' First Amended Complaint (Rec. Doc. No. 49), BellSouth's Motion to Exclude Testimony of Plaintiff's Expert Dr. Bryce Ward (Rec. Doc. No. 48), and the City's Motion for Summary Judgment (Rec. Doc. No. 50). The Court will first address the motions for summary judgment, and thereafter the

motion to exclude.

## II.    MOTIONS FOR SUMMARY JUDGMENT

Three motions for summary judgment have been filed in the present matter: (1)

BellSouth's Motion for Partial Summary Judgment on Claims in the Original Complaint; (2) the

City's Motion for Summary Judgment; and (3) BellSouth's Motion for Partial Summary

Judgment on Plaintiff City of New Orleans' First Amended Complaint.  Before the Court

addresses these motions, it will discuss the appropriate standard of review for a motion for

summary judgment.

### A.    Standard of Review

Summary judgment will be granted only if the pleadings, depositions, answers to

interrogatories, and admissions, together with affidavits show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R.

Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Brown v. City of Houston*, 337

F.3d 539, 540-41 (5th Cir. 2003).  A material fact is a fact which, under applicable law, may

alter the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986);

*Ameristar Jet Charter, Inc. v. Signal Composites, Inc.*, 271 F.3d 624, 626 (5th Cir. 2001).  A

dispute is genuine when a reasonable finder of fact could resolve the issue in favor of either

party, based on the evidence before it.  *Anderson*, 477 U.S. at 250; *TIG Ins. Co. v. Sedgwick

James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002).  "The moving party bears the burden of

demonstrating that there exists no genuine issues of material fact."  *In re Vioxx Prods. Liab.

Litig.* 501 F.Supp.2d 776, 781 (E.D. La. 2007).  When considering a motion for summary

judgment, the Court must "review the facts drawing all inferences most favorable to the party

opposing the motion." *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 137 (5th Cir. 2004). If the

party moving for summary judgment demonstrates the absence of a genuine issue of material fact

"the nonmovant must go beyond the pleadings and designate specific facts showing that there is

a genuine issue for trial." *Willis v. Roche Biomedical Labs., Inc.*, 61 F.3d 313, 315 (5th Cir.

1995).

Furthermore, the mere argued existence of a factual dispute does not defeat an otherwise

properly supported motion. *See Anderson*, 477 U.S. at 248. Therefore, "[i]f the evidence is

merely colorable, or is not significantly probative," summary judgment is appropriate. *Id.* at

249-50 (citations omitted). Summary judgment is also proper if the party opposing the motion

fails to establish an essential element of his case on which they bear the burden of proof. *Patrick*

*v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004). A non-movant's conclusory allegations or bare

assertions unsupported by facts are insufficient to defeat a motion for summary judgment.

*Anderson*, 477 U.S. at 247-48.

**B.      BellSouth's Motion for Partial Summary Judgment on Claims in the
Original Complaint**

BellSouth filed a Motion for Partial Summary Judgment on Claims in the Original

Complaint, arguing that because the City's Original Complaint fails to raise any disputed

material facts, the Court should dismiss all claims raised therein with prejudice. Specifically,

BellSouth claims that the City improperly attempted to increase the compensation BellSouth is

required to pay for use of the City's rights-of-way in direct contravention to the following: the

1879 Franchise Ordinance, Act 124, the Louisiana Supreme Court's decision in *Great Southern*,

and the 2001 Settlement Agreement.

The City has filed a Response in opposition to BellSouth's Motion for Partial Summary

10

Judgment.  The City contends that genuine issues of material fact exist with regard to whether the various agreements entered into by the parties, along with the legislation, ordinances, and jurisprudence, require BellSouth to pay additional compensation for its use of the City's right-of-ways.  The Council has adopted the arguments raised by the City in its Response in opposition to BellSouth's Motion.  *See* Rec. Doc. No. 59.

BellSouth raises five arguments in support of its Motion: (1) the 2001 Settlement Agreement settled all claims relating to compensation between the parties, including claims arising under the 1879 Franchise Ordinance and the 1984 Concession Agreement, and established the legal basis for future compensation; (2) the 1879 Franchise Ordinance was not limited to above-ground use of the City's rights-of-way; (3) BellSouth did not breach the 1879 Franchise Ordinance; (4) the OGA does not apply to BellSouth; and (5) the City has no right to a retroactive LMA Agreement.  The Court will now address these arguments, the City's responses thereto, and consider the parties' positions under the relevant facts and applicable law.

1.  *Whether the 2001 Settlement Agreement settled all claims relating to compensation between the parties, including claims arising under the 1879 Franchise Ordinance and the 1984 Concession Agreement, and established the legal basis for future compensation*

BellSouth claims that the 2001 Settlement Agreement settled all the past and present disputes between the parties relating to compensation, including disputes under the 1879 Franchise Ordinance, the 1906 Agreement, and the 1984 Concession Agreement, and currently governs the compensation between the parties.  Accordingly, BellSouth argues that the present litigation raises issues already resolved by the 2001 Settlement Agreement and thus constitutes an impermissible attempt to relitigate issues already compromised.

In response, the City argues that it is not barred from proceeding with the present

11

litigation.  It characterizes BellSouth's argument as one in *res judicata*, which it claims ultimately fails because the cause of action in the present suit was not in existence at the time of the 2001 Settlement Agreement since it only deals with issues arising post-January 2006.  The City also argues that because the parties anticipated some type of compensation agreement would be in place after January 2006, BellSouth cannot now use the City's right-of-ways for free, resulting in unjust enrichment, simply because certain conditions were not met under the 2001 Settlement Agreement.  The City claims that this Court's interpretation of Section 3.9 of the 2001 Settlement Agreement which discusses these conditions is the real issue between the parties and is properly raised in the present litigation.

In its reply to the City's arguments, BellSouth claims that the compensation it paid pursuant to the 2001 Settlement Agreement, and the ordinances and agreements this Agreement recognizes as valid, is the only compensation it is liable for since the City failed to meet the conditions set out in the 2001 Settlement Agreement which would entitle it to additional future compensation.  BellSouth notes that the 2001 Settlement Agreement provides no options other than the two unsatisfied conditions which would entitled the City to additional compensation.

It is undisputed that the 2001 Settlement Agreement constitutes a compromise under Louisiana law.  *See* La. Civ. Code art. 3071; Pl.'s Brief; Def.'s Brief.  In determining the preclusive effects of a compromise, the Court must look to Louisiana law.  *See Young v. Equifax Credit Info. Servs., Inc.*, 294 F.3d 631, 637 (5th Cir. 2002).  Under Louisiana law, "[a] compromise precludes the parties from bringing a subsequent action based upon the matter that was compromised." La. Civ. Code art. 3080.  With regard to the preclusive effects of a compromise on future claims, the Fifth Circuit has stated,

> The Louisiana courts appear reluctant to construe a compromise agreement broadly, especially with regard to future claims: '[R]eleases of future actions are narrowly construed to assure that the parties fully understand the rights released and the resulting consequences.  As a result, if the release instrument leaves any doubt as to whether a particular future action is covered by the compromise, it should be construed not to cover such future action.'  Further the party interposing a release instrument to support an exception of *res judicata* bears the burden of proof 'to establish the requisites for a valid compromise, including the parties' intent to settle the differences being asserted in the action in which it is interposed.'  *Young,* 294 F.3d at 637 (internal citations omitted).

The Fifth Circuit has also recognized that "[u]nder the Louisiana law of compromise interpretation, a genuine issue of material fact regarding what the parties intended to compromise precludes summary judgment."  *Id*. at 638 (citing *EM Nominee P'ship Co. v. Arkla Energy Res*., 615 So. 2d 1369, 1375 (La. Ct. App. 1993)).

The 2001 Settlement Agreement compromised all disputes, claims, and causes of action arising from the 1879 Franchise Ordinance, the 1906 Agreement, or the 1984 Concession Agreement, whether known or unknown, asserted or unasserted.  *See* Def.'s Ex. 9, Section 3.7. This Agreement terminated the 1906 Agreement and, in its place, required BellSouth to pay the City a fixed annual amount through 2006.  *See id.* at Sections 3.2, 3.3.  The City has brought the present suit alleging that BellSouth owes it compensation in addition to that BellSouth paid through 2006 under the 2001 Settlement Agreement, for BellSouth's use of the City's rights-of-way since 2007.  The Court finds that this is a new claim which did not and could not have existed at the time the 2001 Settlement Agreement, and is not precluded by this compromise. The 2001 Settlement Agreement contains provisions regarding potential methods for BellSouth's payments beginning in 2007, but does not indicate that disputes, claims, and/or causes of action arising out of payments during this time are foreclosed.  Furthermore, there is at least some ambiguity as to whether the City's claim for compensation arises from the 1879 Franchise

Ordinance, the 1906 Agreement, the 1984 Concession Agreement, the documents creating rights and obligations for which the 2001 Settlement Agreement does foreclose further disputes, claims, and/or causes of action, or an entirely independent obligation. Accordingly, the Court denies BellSouth's Motion insofar as its argument that the 2001 Settlement Agreement precludes the present action.

      2.     *Whether the 1879 Franchise Ordinance was limited to above-ground use of the City's rights-of-way*

BellSouth's second argument in its Motion is that the 1879 Franchise Ordinance is not limited to above-ground use of the City's rights-of-way. In support of its argument, BellSouth claims that it has installed its facilities below ground at the City's direction and has done so for decades. Additionally, BellSouth argues that the City is equitably estopped from now asserting that the 1879 Franchise Ordinance limits BellSouth's use of the City's rights-of-way to above-ground use.

In response, the City argues that the 1879 Franchise Ordinance does not authorize BellSouth's below-ground use of the City's rights-of-way. The City claims that the plain language of this Ordinance limits BellSouth's use to above-ground installations. The City further claims that BellSouth fails to put forth any evidence that this Ordinance has been amended by subsequent ordinances to permit below-ground use. Additionally, the City asserts that any below-ground use of the City's rights-of-way by BellSouth was authorized independently from the 1879 Franchise Ordinance by the payment of additional compensation to the City and/or other agreements and ordinances.

Resolution of BellSouth's argument first requires an interpretation of the 1879 Franchise Ordinance. Under Louisiana law, the statutory and jurisprudential rules for the construction and

14

interpretation of state statutes are applicable to the construction and interpretation of municipal ordinances. *Sellers v. City of New Iberia,* 94-1042, p.1 (La. App. 3 Cir. 2/1/95);649 So. 2d 1212, 1213; *Lieber v. Rust*, 388 So. 2d 836 (La. Ct. App. 1980), *aff'd*, 398 So. 2d 519 (La. 1981); *La. Television Broad. Corp. v. Total C.A.T.V.*, 341 So. 2d 1183 (La. Ct. App. 1976), *writ refused*, 343 So. 2d 1076 (La. 1977). Under Louisiana law,

> The paramount consideration in statutory construction is ascertainment of the [law maker's] intent and the reason or reasons which prompted the [lawmaker] to enact the law. It is well established that the starting point for the interpretation of any statute is the language of the statute itself. When a statute is clear and unambiguous and its application does not lead to absurd consequences, the provision is applied as written with no further interpretation made in search of the [lawmaker's] intent. In the event the language of the statute is susceptible of different meanings, the interpretation must best conform to the purpose of the law. *Hays v. La. State Bd. of Elementary & Secondary Educ.*,2008-1386, p. 5 (La. App. 1 Cir. 6/11/10); 2010 WL 2342409 (internal citations omitted).

The 1879 Franchise Ordinance permits BellSouth to "construct and maintain a line or lines of telegraphs" along the City's rights-of-way "at such points and in such manner as to the kind and position of the telegraph poles, the height of the wires above the streets, and in all other particulars, as the Administrator of the Department of Improvements of this city may direct." Def.'s Ex. 1, Section 1. The Ordinance further provides it "shall be subject to any ordinance or ordinances that may hereafter be passed by the City Council concerning the same." *Id*. at Section 2. Considering the Louisiana law on construction and interpretation of ordinances, the Court finds that the language of the 1879 Franchise Ordinance clearly expresses that BellSouth is permitted to construct and maintain telegraph lines, which include poles and wires above the streets, along the City's rights-of-ways. However, the Court is unable to find that this language conclusively limits BellSouth's use of the City's rights-of-way to above-ground use, especially considering that the Ordinance includes the language "and in all other particulars." Accordingly,

the Court concludes that the 1879 Franchise Ordinance is ambiguous as it pertains to whether it authorizes BellSouth's above and below-ground use. Under Louisiana law, "when the language of [an ordinance] is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law. When [an ordinance] is ambiguous...the letter must give way to the spirit of the law and the [ordinance] construed to produce a reasonable result." *Red Stick Studio Dev., LLC v. State of La.*, 2009-1347, p.5 (La. App. 1 Cir. 12/23/09); 30 So. 2d 803. In the present matter, there exist genuine issues of material fact which prevent the Court from determining the "purpose" of the 1879 Franchise Ordinance and/or what would be a "reasonable result" of this Ordinance regarding the type of installations authorized by the 1879 Franchise Ordinance.

A second issue raised by BellSouth's argument is whether the Administrator of the Department of Improvements and/or the Council have properly amended the 1879 Franchise Ordinance to authorize BellSouth's below-ground use of the City's rights-of-way. The City has enacted a number of ordinances since the 1879 Franchise Ordinance requiring electrical wires to be placed underground in certain areas of the City. *See* City of New Orleans Municipal Code of Ordinances, Article V. Secs. 146-359 to 146-372. Additionally, BellSouth has submitted affidavits indicating that the City has issued it a number of permits to install below-ground installations, *see* Def.'s Ex. 12, and that the City permitted BellSouth to maintain below-ground installations at least as early as the 1920's. *See* Def.'s Ex. 20. However, it is not clear if these ordinances and/or permits affect BellSouth's rights under the 1879 Franchise Ordinance or if they operate independently of the Ordinance. Also, the City has submitted controverting evidence indicating that the 1879 Franchise Ordinance has never been properly amended by the

Council.  *See* Pl.'s Ex. E.  These documents demonstrate that there exist genuine issues of material fact as to whether the 1879 Franchise Ordinance has been properly amended to authorize, if it did not already, BellSouth's below-ground use.

A third issue raised by BellSouth's argument is whether the City is estopped from arguing that the 1879 Franchise Ordinance limits BellSouth's use of the City's right-of-ways to above-ground use since it has authorized BellSouth to use below-ground installations.  Under Louisiana law, equitable estoppel, statutorily recognized as detrimental reliance, is based upon Louisiana Civil Code article 1967, *see LaBarge Pipe & Steel Co. v. First Bank,* 550 F.3d 442, 464 n.22 (5th Cir. 2008), which provides that "[a] party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and that the other party was reasonable in so relying."  La. Civ. Code. art. 1967; *LaBarge Pipe & Steel,* 550 F.3d at 464.  In present matter there exist genuine issues of material fact as to whether it was reasonable for BellSouth to rely upon the permits and ordinances issued by the City allowing, if not requiring, below-ground installations as proper amendments to its rights under the 1879 Franchise Ordinance.  There also exist genuine issues of material fact as to whether the City knew or should have known that BellSouth would rely upon these permits and/or ordinances to its detriment.  Accordingly, for the foregoing reasons, BellSouth's argument regarding its right to below-ground installations pursuant to the 1879 Franchise Agreement is denied on summary judgment.

  *3.  Whether BellSouth breached the 1879 Franchise Ordinance*

BellSouth argues that it did not breach the 1879 Franchise Ordinance because it has paid the proper consideration required by the Ordinance.  It claims that the sole consideration due to

the City under the Ordinance is three free telephones, one for the office of each the Mayor, police chief, and fire alarm telegraph.  BellSouth further claims that the 1916 Letter Agreement and the 1984 Concession Agreement did not alter this consideration; rather, BellSouth contends that these agreements changed the method by which this consideration was to be provided.  Finally, BellSouth claims that the sums it has paid annually for over 25 years under these agreements exceed the cost of the three free phones required by the 1879 Franchise Ordinance and thus no breach has occurred.

In response, the City contends that the 1879 Franchise Ordinance requires BellSouth to provide free phone service to entirety of the Mayor's office, the Police Department, and the Fire Department, not just a single phone to each, and that BellSouth has failed to do so.  The City notes the inconsistency of BellSouth arguing, as discussed above, that the 1879 Franchise Ordinance has been expanded with the passage of time to include below-ground installations, but that it has not expanded to provide free phone service to the offices that at one time only required individual phone lines.  The City next claims that the 1984 Concession Agreement and the payments required by BellSouth thereunder do not relieve BellSouth of its obligation under the 1879 Franchise Ordinance to provide free phone service because the 1984 Concession Agreement was never ratified by the Council independently or through the Council's ratification of the 2001 Settlement Agreement which acknowledged the 1984 Concession Agreement.

BellSouth's argument raises a question of statutory interpretation of the 1879 Franchise Ordinance, this time regarding the provision on consideration.  Under Louisiana law,

> The paramount consideration in statutory construction is ascertainment of the [law maker's] intent and the reason or reasons which prompted the [lawmaker] to enact the law.  It is well established that the starting point for the interpretation of any statute is the language of the statute itself.  When a statute is clear and unambiguous and its

18

application does not lead to absurd consequences, the provision is applied as written with no further interpretation made in search of the [lawmaker's] intent.  In the event the language of the statute is susceptible of different meanings, the interpretation must best conform to the purpose of the law.  *Hays v. La. State Bd. of Elementary & Secondary Educ.*,2008-1386, p. 5 (La. App. 1 Cir. 6/11/10); 2010 WL 2342409 (internal citations omitted).

Furthermore, "when the language of [an ordinance] is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law.  When [an ordinance] is ambiguous...the letter must give way to the spirit of the law and the [ordinance] construed to produce a reasonable result."  *Red Stick Studio Dev., LLC v. State of La.*, 2009-1347, p.5 (La. App. 1 Cir. 12/23/09); 30 So. 2d 803.

The consideration provision of the 1879 Franchise Ordinance provides that BellSouth "shall connect their wires with the Mayor's office, chief of police office and fire alarm telegraph office, and place and keep telephones therein, free of charge to the city, so that the said telephones may be used in connection with all wires under the control of said company."  Def.'s Ex. 1.  The Court finds that, based upon the clear language of this provision, BellSouth has an obligation to provide free phone service to certain City offices.  This fact does not appear to be in dispute, only the extent of this obligation.  *See* Pl.'s Brief; *see also* Def.'s Brief.  However, the Court finds that the language of the statute pertaining to the number of free phones and the offices in which these phones are to be placed is ambiguous.  The connection of "wires" to the offices and the placement of "telephones" therein, without any indication as to the quantity of wires or telephones, suggests any number of telephones are to be provided to these offices free-of-charge.  However, the specific listing of these three offices suggests that each of these offices was to receive a telephone.  Furthermore, the 1916 Letter Agreement indicates that at one time the parties interpreted this provision as requiring BellSouth to provide only three free telephones,

one to each office.  *See* Def.'s Ex. 4 ("[i]n addition to the three free telephones which the

Company furnishes to the City under its franchise obligation").  Additionally, it is not clear

whether the offices which are to receive the free telephone service are the entirety of the offices

of each City department or a single office within each department, nor is it clear whether these

offices exist contemporaneously.

The foregoing factual issues demonstrate the Court's inability at this time to determine

the purpose and the reasonable result of the 1879 Franchise Ordinance as it pertains to the

quantity of free phone service and which offices are to receive this service required thereunder.

Because the Court is unable at this time to make a determination as to the extent of the free

phone service required under the 1879 Franchise Ordinance, it is also unable to make a

determination as to whether BellSouth has breached this Ordinance.  Accordingly, the Court

denies BellSouth's Motion as it pertains to the alleged breach of the consideration provision of

the 1879 Franchise Ordinance.

BellSouth's argument also raises a question of interpreting the 1916 Letter Agreement

and the 1984 Concession Agreement, the agreements BellSouth alleges modified the

consideration due under the 1879 Franchise Ordinance.  Under Louisiana law "[i]nterpretation of

a contract is the determination of the common intent of the parties."  La. Civ. Code art. 2045.

"When the words of a contract are clear and explicit and lead to no absurd consequences, no

further interpretation may be made in search of the parties' intent."  La Civ. Code art. 2046.  A

court looks to extrinsic evidence "only when a contract is found to be ambiguous after an

examination of the four corners of the agreement, or when it is susceptible to more than one

interpretation, or the intent of the parties cannot be ascertained."  *Perkins v. Entergy Corp.*,

2009-0632, p.8 (La. App. 1 Cir. 6/10/10); 2010 WL 2332357 (citing *Sanders v. Ashland Oil, Inc.*, 96-1751(La. App. 1 Cir. 6/20/97); 696 So. 2d 1031, 1036. "The intent behind a contract is an issue of fact that is to be inferred from all of the surrounding circumstances, including the conduct of the parties before and after the formation of the contract. *Spohrer v. Fore*, 2009-1295 (La. App. 1 Cir. 6/11/10); 2010 WL 2342658 (citing *Naquin v. La. Power & Light Co.*, 2005-2103 (La. App. 1 Cir. 9/15/06); 943 So. 2d 1156, 1164.

Considering the Louisiana law on interpretation of contracts, the Court finds that neither the 1916 Letter Agreement nor the 1984 Concession Agreement had any effect upon the obligation of BellSouth to provide free phone service to the City pursuant to the 1879 Franchise Ordinance. With regard to the 1916 Letter Agreement, the Court finds this Agreement created a new, distinct obligation for BellSouth to provide reduced telephone service rates and 25 free phones to the City. This is indicated by the language "*[i]n addition* to the three free telephones which [BellSouth] furnishes to the City under its *franchise obligation*." Def.'s Ex. 4 (emphasis added). Additionally, the Court finds that the 1984 Concession Agreement changed the method for BellSouth to compensate the City for its obligations under the 1916 Letter Agreement to provide reduced telephone service rates and 25 free phones, but does not affect BellSouth's obligations under the separate 1879 Franchise Ordinance. This is indicated by the following language in the 1984 Concession Agreement, "the proposal agreed to hereby is an amendment solely to the letter agreement dated January 28, 1916....nothing herein shall be deemed to affect, or be construed to restrict, the obligations of [BellSouth]...required by..Ordinance...4906 A.S. (1879 Franchise Ordinance)." Def.'s Ex. 5. Accordingly, the consideration remitted by BellSouth to the City under these agreements was done exclusive of its obligations under the

1879 Franchise Ordinance.

With regard to BellSouth's argument for the validity of the 1984 Concession Agreement, and implicitly the 1916 Letter Agreement, the Court declines to reach a conclusion on summary judgment. The Court has determined that the 1916 Letter Agreement and 1984 Concession Agreement have no effect upon nor amended the 1879 Franchise Ordinance. Accordingly, whether or not these agreements were valid has no effect upon this Court's determination of the extent of free telephone service BellSouth owes the City under the 1879 Franchise Ordinance or the ultimate issue of whether BellSouth owes the City additional compensation for its use of the City's rights-of-way. However, the Court recognizes that the City's Complaint raises the issue of the validity of the 1984 Concession Agreement in its request for declaratory relief. The Court finds that this issue raises genuine issues of material fact since this Agreement was not ratified by the Council as required by the City's Home Rule Charter, yet BellSouth has remitted consideration thereunder which the City accepted for a number of years, and the 2001 Settlement Agreement which was ratified by the Counsel, acknowledges this Agreement.

4.      *Whether the OGA applies to BellSouth*

BellSouth next argues that its use of the City's rights-of-way is not subject to the provisions of the OGA because (1) such use is authorized pursuant to the 1879 Franchise Ordinance and Act 124, and (2) the OGA does not apply to pre-existing franchises such as the 1879 Franchise Ordinance which do not acknowledge susceptibility to the OGA. Additionally, BellSouth argues that the Louisiana Supreme Court's decision in *Great Southern* and its affirmation in *Broussard v. South Central Bell,* 1992 WL 96304, at *6 (E.D. La. Apr. 30, 1992), prevent the City from requiring additional consideration under the OGA for BellSouth's rights

under 1879 Franchise Ordinance.  BellSouth submits a video clip from a 1996 Council meeting during which the Council acknowledged that the OGA does not apply to BellSouth.  BellSouth also submits a 2001 letter from the Council's attorney to BellSouth's attorney which acknowledged that BellSouth was not required to obtain a franchise under the OGA.

In response, the City contends that the OGA applies to BellSouth's use of below-ground installations on the City's rights-of-way, a use which is not authorized pursuant to the 1879 Franchise Ordinance.  It distinguishes *Great Southern* on the basis that it prevents additional compensation for the above-ground installation rights conferred by the 1879 Franchise Ordinance but has no bearing on rights or obligations between the parties independent of the Ordinance.  The City further contends that the 1996 video clip submitted by BellSouth involved the issue of whether the OGA applied to BellSouth's rights under the 1906 Agreement which required BellSouth to pay 3% of certain profits.  The City claims that once BellSouth stopped paying under the 1906 Agreement and the 2001 Settlement Agreement which superceded the 1906 Agreement, it became susceptible to the OGA for its below-ground use of the City's rights-of-way.  The City submits excerpts from a deposition with BellSouth's designated corporate representative in which the representative admits that he does not know of any documents or evidence that suggest BellSouth is not subject to the OGA.

BellSouth's argument requires the Court to interpret the OGA.  As discussed above, the Louisiana law on statutory interpretation also applies to interpretation of municipal ordinances. *Sellers v. City of New Iberia*, 94-1042 (La. App. 3 Cir. 2/1/95); 649 So. 2d 1212, 1213; *Lieber v. Rust*, 388 So. 2d 836 (La. Ct. App. 1980), *aff'd*, 398 So. 2d 519 (La. 1981); *La. Television Broad. Corp. v. Total C.A.T.V.*, 341 So. 2d 1183 (La. App. 1st Cir. 1976), *writ refused*, 343 So. 2d 1076

(La. 1977). The Louisiana Supreme Court has provided the following guidance to courts in

interpreting statutes,

> As the fundamental question in all cases of statutory interpretation is legislative intent, the rules of statutory construction are designed to ascertain and enforce the intent of the Legislature. One determines the meaning and intent of a law 'by considering the law in its entirety and all other laws on the same subject matter and by placing a construction on the law that is consistent with the express terms of the law and with the obvious intent of the legislature in enacting the law.' A statute must be applied and interpreted in a manner that is logical and consistent with the presumed fair purpose and intent of the Legislature in enacting it. The text of the law is the best evidence of legislative intent.

> Words and phrases must be read with their context and construed according to common and approved usage of the language. 'The word 'shall' is mandatory and the word 'may' is permissive.' Further, every word, sentence, or provision in a law is presumed to be intended to serve some useful purposes, that some effect is given to each such provision, and that no unnecessary words or provisions were employed. Consequently, courts are bound, if possible, to give effect to all parts of a statute and to construe no sentence, clause of word as meaningless and surplusage if a construction giving force to and preserving all words can legitimately be found. *Black v. St. Tammany Parish Hops.*, 25 So. 3d 711, at *9-10 (La. 2009)(internal citations omitted).

The question before the Court is whether the OGA applies to BellSouth. In its

"Applicability" section the OGA provides,

> 1) <u>In General</u>. This Act shall be generally and immediately applicable to any Person occupying the public Rights-of-Way for the installation, maintenance, repair and/or operation of Wireline Telecommunications Systems, and for the purpose of determining compensation payable to the City under pre-existing franchises, permits, and privileges granted by the City, which acknowledge susceptibility to an Ordinance of General Application or Ordinance of General Applicability. Section 30-54 of this Act shall apply to any Person submitting an application to furnish Wireline Telecommunications Systems which occupy the Rights-of-Way or other Public Property. Persons operating pursuant to pre-existing franchises shall remain subject to all existing provisions of such pre-existing franchises, as well as being subject to the provisions of Section 30-50(a), (c), and (d) of this Act; however, Persons with existing franchises or permits and privileges at the time of enactment of this Act shall come under all other provisions of this Act if and when such franchises or permits and privileges are renewed. Pre-existing permits and privileges, if renewed, shall be renewed as Franchises under the provisions of this Act. Def.'s Ex. 7.

Relying upon Louisiana's statutory interpretation rules, the Court finds that BellSouth is

generally subject to the OGA since it is undisputed that BellSouth "occup[ies] the public Rights-of-Way for the installation, maintenance, repair and/or operation of Wireline Telecommunications Systems." *Id*. However, the Court must consider the other provisions in the "Applicability" section to determine *how* the OGA applies to BellSouth. First, BellSouth has certain disputed rights under the 1879 Franchise Ordinance, a pre-existing franchise. Regarding pre-existing franchises, the OGA "determin[es] compensation payable to the City under pre-existing franchises, permits and privileges granted by the City, which acknowledge susceptibility to an Ordinance of General Application or Ordinance of General Applicability." *Id*. The OGA further provides,

> Persons operating pursuant to pre-existing franchises shall remain subject to all existing provisions of such pre-existing franchises, as well as being subject to the provisions of Section 30-50(a), (c), and (d) of this Act; however, Persons with existing franchises or permits and privileges at the time of enactment of this Act shall come under all other provisions of this Act if and when such franchises or permits and privileges are renewed. *Id*.

The relevant portion of Section 30-50 cited above states,

> (a) <u>Existing Franchises Subject to Ordinance of General Application</u>. For existing Franchises and permits and privileges which are subject to an Ordinance of General Application, as compensation for the occupancy of Public Property and of the Rights-of-Way of the City for the construction, operation, maintenance, and/or the reconstruction of a Wireline Telecommunications System within the City, the value of such rights and privileges granted by the Franchise, the fact that the Rights-of-Way contain limited and finite capacity, the administration of this Act and the Franchise by the Grantor, the usage and interference with the public's use of Rights-of-Way, the reduction in the useful life of the Rights-of-Way and other costs and obligations undertaken by the Grantor herein, the Grantee shall be subject to all existing provisions of its Franchise, permits and privileges and the Grantee shall pay to the Grantor and annual compensation to be calculated as stated below. *Id*.

Applying these provisions to BellSouth, the Court finds that BellSouth's rights, whatever they are determined to be, under the 1879 Franchise Ordinance are not subject to the OGA.

Because the Court must give effect to all words and phrases in the OGA, it interprets the OGA as requiring additional compensation from only those pre-existing franchises "which acknowledge susceptibility to an Ordinance of General Application or Ordinance of General Applicability," *id.*, and notes that the 1879 Franchise Ordinance does not acknowledge any such susceptibility. If the City or Council desired to receive additional compensation from *all* pre-existing franchises they would not have included this qualifying phrase. Furthermore, the provision in the OGA which sets out the compensation due from pre-existing franchises only requires compensation from pre-existing franchises "subject to an Ordinance of General Application." *Id.* Looking at the ordinance in its entirety, as the Court is required, the Court finds that the OGA's definition of pre-existing franchises subject to an Ordinance of General Application are those under the "Applicability" section "which acknowledge susceptibility to an Ordinance of General Application or Ordinance of General Applicability." *Id.* The Court notes that exempting BellSouth's rights and obligations under the 1879 Franchise Ordinance from the OGA is also consistent with the Louisiana Supreme Court's decision in *Great Southern*, which precluded the City from increasing the consideration due under the 1879 Franchise Ordinance.

A second issue raised by BellSouth's argument is whether the OGA applies to BellSouth for its use of rights-of-way not authorized by the 1879 Franchise Ordinance. As discussed above, the Court is not able to decide on summary judgment whether BellSouth's below-ground use of the City's rights-of-way is authorized by the 1879 Franchise Ordinance. Accordingly, the Court makes no ruling as to whether the OGA would apply to BellSouth's use of the City's rights-of-way for below-ground installations. However, as the Court has found that the OGA applies generally to BellSouth as a telecommunications provider utilizing the City's rights-of-

way, the Court does not foreclose the possibility that the OGA could apply to BellSouth for any franchise rights not covered by the 1879 Franchise Ordinance, but presently refrains from making a ruling insofar.

     5.     *Whether the City is entitled to a retroactive LMA Agreement*

BellSouth argues that the City has no right to a retroactive LMA Agreement because the City failed to exercise this right timely under the 2001 Settlement Agreement. Additionally, BellSouth notes that the 2001 Settlement Agreement provides that the City can elect to enter into a LMA Agreement only by ordinance and no ordinance was ever issued. BellSouth argues that retroactive application of the LMA Agreement is not permissible under statutory rules. Finally, BellSouth claims that retroactive application of the LMA Agreement would deny BellSouth its right to recoup payments through its customers for the past years, resulting in an unconstitutional confiscation of its property.

In response, the City challenges BellSouth's claim that entering into a retroactive LMA Agreement would prevent it from recouping payments through its customers for past years' payments. The City claims that there are a number of ways in which BellSouth can recoup its payments under a retroactive LMA that would not result in BellSouth losing these funds entirely. Additionally, the City argues that BellSouth has been knowingly unjustly enriched by utilizing the City's rights-of-way since 2007 without compensating the City. The City supports this claim by noting that BellSouth has agreed to enter into a contemporaneous LMA Agreement, but refuses to enter into a retroactive LMA for the years since 2007 or become subject to the OGA for these years.

The provision at issue in the 2001 Settlement Agreement, Section 3.9, provides in

pertinent part,

> As further consideration for the settlement embodied in this Agreement, BellSouth and the City agree that if the State of Louisiana does not enact the Simplified Tax Legislation prior to January 2007, then during the calendar year 2007, the City may by ordinance elect to enter the LMA Agreement attache hereto....all such payments due to the City under such agreement shall be subject to the pass through provisions of La. R.S. 33:4510. Def.'s Ex. 9.

It is undisputed that (1) the Simplified Tax Legislation was not enacted prior to January 2007, and (2) the City did not issue an ordinance executing the LMA Agreement during 2007. Under Louisiana law, a conditional obligation is one dependant on an uncertain event. La. Civ. Code art. 1767. If the obligation may not be enforced until the certain event occurs the condition is suspensive. *Id.* A "condition is considered to have failed once it is certain that the event will not occur." *Jackson v. Lare*, 779 So. 2d 808, 816 (La.App. 2 Cir. 2000). Courts do not construe provisions in a contract as suspensive conditions unless the express contract language compels such construction. *Lake Forest Management, LLC v. HealthMark Partners, LLC*, 2004 WL 1794555, at * (E.D. La. Aug. 9, 2004)(citing *Hampton v. Hampton*, 713 So. 2d 1185, 1190 (La.App. 1 Cir. 1998)).

The Court finds that the express language of Section 3.9 creates a suspensive condition between the parties. Here, the suspensive condition of the City entering the LMA Agreement by ordinance during the calendar year 2007 was never met and is no longer possible, thus the City does not have the right now to demand performance from BellSouth under the LMA Agreement. Furthermore, the Court is not authorized by the terms of the 2001 Settlement Agreement or otherwise to order the retroactive application of the LMA Agreement. Accordingly, the Court grants BellSouth's Motion insofar as it pertains to the retroactive application of the LMA Agreement under the 2001 Settlement Agreement. However, this holding is not to be construed

as determinative of whether the City is entitled to compensation from BellSouth for BellSouth's use of the City's rights-of-way since 2007, or whether generally an LMA Agreement is a permissible method of compensation for this use.

With regard to the City's argument that BellSouth has been unjustly enriched by using the City's rights-of-way since 2007 without payment to the City, the Court finds that there exist genuine issues of material fact precluding summary judgment. Under Louisiana law, the following elements must be established for an unjust enrichment claim,

> (1) there must be an enrichment, (2) there must be an impoverishment, (3) there must be a connection between the enrichment and the impoverishment, (4) there must be an absence of 'justification' or 'cause' for the enrichment and impoverishment, and finally (5) the action will only be allowed when there is no other remedy at law, i.e., the action is subsidiary or corrective in nature. *Richard v. Wal-Mart Stores, Inc*., 559 F.3d 341, 346 (5th Cir. 2009)(quoting *Minyard v. Curtis Prods., Inc*., 205 So. 2d 422, 432 (La. 1968)).

Applying this law to the present matter, the Court finds there are factual disputes as to whether the City is "impoverished" by BellSouth's use of its rights-of-way, whether BellSouth's use of these rights-of-way without allegedly compensating the City is justified, and whether the City has other remedies at law.

### C.      The City's Motion for Summary Judgment

The City has filed a Motion for Summary Judgment seeking the following declarations from the Court: (1) the OGA applies to BellSouth's uses of the City's rights-of-way beginning January 1, 2007, and that BellSouth must pay those amounts due thereunder for said uses; (2) by virtue of BellSouth's failure to provide free telephone service as required in the 1879 Franchise Ordinance, this Ordinance has been breached and the City may terminate the same; and (3) the 1984 Concession Agreement entered into by BellSouth and then-Mayor Ernest Morial, without ratification by the Council as required under the City's Home Rule Charter, is null, void, and did

not alter BellSouth's obligations under the 1879 Franchise Ordinance. BellSouth has filed a Response in opposition to the City's Motion for Summary Judgment. BellSouth contends that the OGA is inapplicable, it has not breached the 1879 Franchise Ordinance, and the 1984 Concession Agreement remains in effect. The Council has adopted the arguments raised by the City in its Motion. *See* Rec. Doc. No. 73.

The Court will now address the arguments raised by the City in its Motion. A number of the issues implicated in these arguments have already been addressed in the Court's discussion of BellSouth's Motion for Partial Summary Judgment on the Original Complaint; accordingly, the Court will refer to these discussions rather than repeating itself on these issues.

1. *Whether the OGA applies to BellSouth*

The City argues that the OGA applies to BellSouth because it fits the OGA's definition for applicability as a telecommunications provider in the New Orleans market who uses the City's streets and rights-of-way. The City further argues that BellSouth enjoys no exceptions to the applicability of the OGA. In response, BellSouth argues that it is exempt from the OGA because (1) the 1879 Franchise Ordinance does not acknowledge susceptibility to an Ordinance of General Application or Applicability, (2) *Great Southern* prevents the City from changing the compensation due from BellSouth under the 1879 Franchise Ordinance, and (3) the City's conduct since the inception of the OGA demonstrates that the OGA does not apply to BellSouth. The Court has already considered these arguments in the context of BellSouth's Motion for Partial Summary Judgment on the Original Complaint. Accordingly, for the reasons stated therein, the Court grants the City's Motion insofar as finding that the OGA applies generally to BellSouth, denies the City's Motion insofar as finding that the OGA requires BellSouth to pay

additional compensation for its rights, whatever they are determined to be, under the 1879 Franchise Ordinance, and denies the City's Motion insofar as it requires the Court to make a determination at this time as to whether the OGA governs BellSouth's franchise rights independent of the 1879 Franchise Ordinance.

Additionally, the City argues that the 2001 Settlement Agreement does not prevent the OGA from applying to BellSouth. The City interprets the 2001 Settlement Agreement's provision on the LMA Agreement as providing one option, but not the only option, for creating an agreement between the parties for compensation, thus leaving open the possibility that the OGA could also provide a method for compensation. The City also claims that interpreting this provision as a mandatory provision, foreclosing any compensation agreement because it is not satisfied, is impractical and would result in BellSouth's unjust enrichment.

In response, BellSouth argues that the 2001 Settlement Agreement precludes the application of the OGA. BellSouth notes that this Agreement expressly recognizes the holding in *Great Southern* which precludes imposing additional compensation under the 1879 Franchise Ordinance. BellSouth also notes that even though the OGA was in existence, the 2001 Settlement Agreement does not mention it as a possible method of compensation. BellSouth argues that there is no evidence to support findings that the parties intended to leave open the possibility of the application of the OGA and that the parties contemplated future agreements to prevent BellSouth's unjust enrichment.

As discussed above, the Court has already determined that the OGA does not apply to whatever rights, if any, are granted to BellSouth under the 1879 Franchise Ordinance. If it is determined that BellSouth's use, or certain uses, of the City's rights-of-way is not pursuant to the

1879 Franchise Ordinance, the Court does not find that the 2001 Settlement Agreement

precludes the possibility of the OGA applying to such use, but declines to make a decision one

way or the other on summary judgment.  Under Louisiana law, "[t]he meaning and intent of the

parties to a written instruments, including a compromise, is ordinarily determined from the four

corners of the instrument." *Chalmette Retail Ctr., LLC v. Lafayette Ins. Co.*, 2009-0217 (La.

App. 4 Cir. 10/16/09); 21 So. 3d 485 (citing *Brown v. Drillers, Inc.*, 630 So. 2d 741, 748 (La.

1994)).  "[T]he use of extrinsic evidence is proper only when a contract is found to be

ambiguous after an examination of the four corners of the agreement, or when it is susceptible to

more than one interpretation, or the intent of the parties cannot be ascertained." *Perkins v.*

*Entergy Corp.*, 2009-0632, p.8 (La. App. 1 Cir. 6/10/10); 2010 WL 2332357 (citing *Sanders v.*

*Ashland Oil, Inc.*, 96-1751(La. App. 1 Cir. 1997); 696 So. 2d 1031, 1036, *writ denied*, 97-1911,

703 So. 2d 29 (La. 1997).  The 2001 Settlement Agreement contains two provisions regarding

the method of compensation between the parties post-2006.  These methods are the passage of

simplified tax legislation and the issuance of an ordinance for the LMA Agreement.  Both

methods were unambiguously written as suspensive conditions which ultimately were not

satisfied and thus cannot govern compensation between the parties.  Because these provisions,

the only ones regarding compensation post-2006, were unambiguous, the Court is limited to

considering the language within the four corners of the agreement.  After such consideration, the

Court finds that the 2001 Settlement Agreement contains no provisions providing that

compensation between the parties post-2006 was to be limited to these methods of compensation

nor is there a provision to the effect that the OGA is inapplicable for this time period.

Accordingly, if the Court finds BellSouth owes compensation to the City for its use of the City's

rights-of-way post-2006, the possibility of the OGA governing the method of this compensation is not foreclosed by the 2001 Settlement Agreement.

2.    *Whether BellSouth has breached the 1879 Franchise Ordinance*

The City argues that by virtue of BellSouth's failure to provide free telephone service as required in the 1879 Franchise Ordinance, this Ordinance has been breached and the City is entitled to terminate the Ordinance. Additionally, the City argues that the Council's ratification of the 2001 Settlement Agreement, which referenced the 1984 Concession Agreement, does not relieve BellSouth from its 1879 Franchise Ordinance obligations. In response, BellSouth argues that it has not breached the 1879 Franchise Ordinance because it has continued to fulfill its obligations under the 1984 Concession Agreement which properly amended its obligations under the Ordinance.

The Court has already addressed these issues in its analysis of BellSouth's Motion for Partial Summary Judgment on the Original Complaint. The Court found therein, as it does now, that BellSouth remains obligated pursuant to the 1879 Franchise Ordinance to provide free phone service to the City independent of any subsequent agreements or ordinances. The Court also finds that, for the reasons given in its previous analysis, that it is unable to determine the validity of the 1916 Letter Agreement or the 1984 Concession Agreement on summary judgment, but nevertheless finds even if they were valid, they have no effect upon the obligation of BellSouth to provide free phone service to the City. The Court further finds that there exist genuine issues of material fact as to the extent of free telephone service BellSouth is required to provide under the 1879 Franchise Ordinance. Accordingly, the Court is unable to rule on summary judgment whether BellSouth has breached this Ordinance.

**D.      BellSouth's Motion for Partial Summary Judgment on the City's First Amended Complaint**

The City filed a First Amended Complaint alleging that BellSouth intends to use the City's rights-of-way it currently occupies to provide U-Verse services to its customers through an open video and/or cable system.  *See* Rec. Doc. No. 20.  The City claims that BellSouth has already constructed U-Verse related improvements upon these rights-of-way, such as Video Ready Access Devices ("VRAD") boxes.  *See id.*  The City contends that these improvements have been done without satisfaction of applicable permitting and other requirements, including, but not limited to Section 30-44(b)(4) of the City's Wireline Telecommunications Franchise Act and the federal Cable Act embodied in 47 U.S.C. § 521, *et seq*.  *See id.*  Additionally, the City claims that BellSouth is currently marketing its U-Verse services to customers in New Orleans and that BellSouth intends to provide U-Verse services to its customers during the pendency of these proceedings in violation of the foregoing requirements.  *See id.*  The City seeks both preliminary and permanent injunctions "enjoining BellSouth from (a) offering, providing, or transmitting any covered video and/or television services over an Open Video System, Wireline Telecommunications System, or Cable System utilizing the City's rights-of-way, and (b) constructing, improving, installing, maintaining, or building out any Open Video System, Wireline Telecommunications System, or Cable System on the City's rights-of-way."  *Id.*

In response to the new allegations in the City's First Amended Complaint, BellSouth filed a Motion for Partial Summary Judgment arguing that the City's U-Verse claims are unsubstantiated and false, and requesting that the Court dismiss these claims with prejudice.  *See* Rec. Doc. No. 49.  BellSouth asserts that it does not now and has never provided or marketed U-Verse services in New Orleans and has not installed any VRAD boxes or similar equipment

necessary for providing U-Verse services within the City's rights-of-way. BellSouth contends that the City has failed to put forth any evidence demonstrating otherwise. BellSouth claims that the new articles, press releases and print outs from an AT&T website concerning U-Verse and upon which the City relies for its U-Verse related allegations, do not involve New Orleans. BellSouth further claims that no witnesses deposed thus far can substantiate the City's U-Verse claims. Finally, BellSouth admits that it has installed certain facilities which have U-Verse capabilities, but asserts that these facilities are currently being used to provide telephone and internet services only.

In response, the City argues that it has put forth sufficient evidence of the claims asserted in its First Amended Complaint and requests that BellSouth's Motion be denied. The City largely relies upon the deposition of BellSouth's former state president, Bill Olivier, to support its response. The City claims that Mr. Olivier stated that BellSouth intends to begin offering U-Verse in New Orleans in the near future, but not in 2010. The City further claims that Mr. Olivier estimated that it would only take six months to get U-Verse set up and operating in New Orleans. Additionally, the City claims that Mr. Olivier stated that much of the infrastructure necessary for U-Verse service in New Orleans, such as VRAD boxes and fiber optic cabling, are already in place. Finally, the City claims that Mr. Olivier admitted that BellSouth is required to enter into an agreement with the City to use the public rights-of-way before it can offer U-Verse service in New Orleans, and that it would not offer this service to its customers without first having an agreement in place with the City. The Council adopts and incorporates the response of the City. *See* Rec. Doc. No. 59.

Under Louisiana law, "[a]n injunction shall be issued in cases where irreparable injury,

loss, or damage may otherwise result to the applicant."  La. Code Civ. Pro. 3601(A).  "An

injunction is a harsh, dramatic, and extraordinary remedy, and should only issue where the party

seeking it is threatened with irreparable loss or injury without adequate remedy at law."

*Lefreniere Park Found. v. Friends of Lafreniere Park, Inc*., 97-152 (La. App. 5 Cir. 7/29/97);

698 So. 2d 444, 452, *writ denied*, 97-2196, 703 So. 2d 1312 (La. 1997).  "In order to obtain a

preliminary injunction a plaintiff must show that he will suffer irreparable harm if the injunction

is not granted, that he is entitled to the relief sought, and he must make a *prima facie* showing

that he will prevail on the merits."  *Id*. at 452.  A permanent injunction requires a showing of a

preponderance of the evidence to support its issuance.  *Reasonover v. Lastrapes*, 09-1104, p.3

(La. App. 5 Cir. 5/11/10); 2010 WL 1856328 (citing *West Pub. Co. v. Intrastate Pipeline Corp*.,

254 So. 2d 643, 647 (La. Ct. App. 1971), *writ denied*, 256 So. 2d 290 (La. 1972)).  "Irreparable

injury means the moving party cannot be adequately compensated in money damages for his

injury or suffers injuries which cannot be measured by pecuniary standards."  *Id*. at 453.

In the present matter, the Court finds that facts the City relies upon to support its claims,

namely those from the deposition of Mr. Olivier, are insufficient to warrant injunctive relief. Mr.

Olivier states that although BellSouth may provide U-Verse service in New Orleans at some

indeterminate time in the future and it has some U-Verse supporting infrastructure in place in

New Orleans, BellSouth does not provide U-Verse service in New Orleans nor has it taken

sufficient steps towards doing so.  Mr. Olivier also indicated that BellSouth understands it must

comply with certain requirements before offering U-Verse services in New Orleans and that it

has the intention of doing so when and if it offers this service.  The City cannot demonstrate that

these undisputed facts support a finding of irreparable injury, loss, or damage at the present time.

Accordingly, BellSouth's Motion for Partial Summary Judgment on the First Amended Complaint is granted.

### III.    BellSouth's Motion to Exclude Testimony of Expert Dr. Bryce Ward

The City has introduced the expert report of Dr. Bryce Ward of ECONorthwest who has been retained to testify as to the economic aspects of the OGA.  Specifically, Dr. Ward opines that charging for the use of rights-of-way is appropriate and that the gross percentage and per linear foot fees in the OGA are "fair and reasonable" and "non-discriminatory."  In response to Dr. Ward's expert report, BellSouth filed a Motion to Exclude the Testimony of the City's Expert Dr. Bryce Ward.  *See* Rec. Doc. No. 48.  BellSouth's Motion raises *Daubert* challenges to Dr. Ward's proposed expert testimony.  The Court will now discuss the appropriate standard of review under *Daubert*, and then address the parties' arguments, followed by its analysis and conclusions.

"Trial courts have 'wide discretion' in deciding whether or not a particular witness qualifies as an expert under the Federal Rules of Evidence."  *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998).  Federal Rule of Evidence 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

This Rule reflects the Supreme Court's decisions of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137 (1999).  *Daubert* charges trial courts to act as "gate-keepers" to ensure that the proffered expert testimony is both

relevant and reliable. *Daubert*, 509 U.S. at 589. The relevant and reliable standard announced in *Daubert* for scientific expert testimony applies to all types of expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. at 147.

*Daubert* provides a two-prong test for determining the admissibility of expert testimony. The court "must determined at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592. Both prongs of the *Daubert* test must be satisfied before the proffered expert testimony may be admitted. *Id*. at 595. This analysis "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.*

Thus, the first prong of *Daubert* focuses on whether the expert testimony is based on a reliable methodology. In determining an expert's reliability, the Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595. The second prong, i.e., whether the proposed testimony will assist the trier of fact to understand or determine a fact in issue, goes primarily to the issue of relevancy. *Id*. at 591. Indeed, this examination is described in *Daubert* as whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute. *Id.* (citing *United States v. Downing*, 753 F.2d 1224, 1242 (3rd Cir. 1985)). Federal Rule of Evidence 401 defines "relevant evidence" as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

When expert testimony is challenged under *Daubert*, the burden of proof rests with the party seeking to present the testimony. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269 (5th Cir. 1998). To meet this burden, a party cannot simply rely on its expert's assurances that he has utilized generally accepted scientific methodology. Rather, some objective, independent validation of the expert's methodology is required. *Id.* Nonetheless, the Court's role as a gatekeeper does not replace the traditional adversary system and the place of the jury within that system. *Daubert*, 509 U.S. at 596. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)). Furthermore, the Fifth Circuit has noted "'the jury's role as the proper arbiter of disputes between conflicting opinions. As a general rule, questions relating to the bases and sources of an expert's opinion rather than its admissibility and should be left for the jury's consideration.'" *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996)(quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

BellSouth raises twelve *Daubert* challenges to Dr. Ward's proposed expert testimony. These challenges are:

> (1)     Dr. Ward states that municipal fees are justified as compensation for a telephone company's use of the public right-of-ways, but fails to explain why municipalities do not charge citizens for use of streets and sidewalks.

> (2)     Dr. Ward's testimony regarding "congestion pricing" is flawed and irrelevant because the City's fee under the OGA is applied without regard to congestion pricing.

> (3)     Dr. Ward is not a real estate appraiser, broker, or agent, yet he opines as to the market value of use of rights-of-way.

> (4)     Dr. Ward's real estate appraisal methods for calculating the fair market value of

rights-of-way were developed for purchasing rights-of-way, and are inappropriate in the context of setting municipal fees.

(5)     Dr. Ward does not use or properly use his own proposed real estate appraisal methods.

(6)     Dr. Ward concludes that the City's fees are "fair and reasonable" even though he admits that these terms are not used in the field of economics, the field of his expertise.

(7)     Dr. Ward's sole basis for concluding that the City's fees are fair and reasonable is a comparison of the percentage that New Orleans charges with the percentage that some other cities charge, which are entirely subjective and do not demonstrate a proper application of the comparable-transactions method of real estate appraisal.

(8)     In comparing the percentage of fees New Orleans charges with the percentages charged by other cites, Dr. Ward improperly failed to consider the defined revenue base to which these percentages were applied.

(9)     Several of the municipal fees in Dr. Ward's comparative groups of cities are not charged for the use of public rights-of-way and thus cannot be considered.

(10)    Dr. Ward relies upon a report done for the City of Portland involving per linear foot charges to a company that makes limited use of the rights of way, to determine similar charges are appropriate for BellSouth in New Orleans, yet BellSouth has unlimited use of the rights-of-way.

(11)    Dr. Ward failed to consider past agreements between the parties, and instead looked to similar agreements between other cities and utility companies to determine that the price charged by the City is fair and reasonable.

(12)    Dr. Ward asserted legal opinions without appropriate expertise; for example, he suggests that if the City does not charge BellSouth for its use of the public rights-of-way, the City would violate the Louisiana Constitution.

In response, the City argues that under *Daubert,* Dr. Ward is qualified to testify competently, he has reached his conclusions by employing a reliable methodology, and his testimony will assist the Court in understanding the evidence.  The City notes that Dr. Ward is a senior economist at ECONorthwest which provides analysis in economics, finance, planning and policy evaluation for businesses and governments; furthermore, Dr. Ward has his Ph.D. in

economics from Harvard University and has been published and testified on a number of occasions regarding telecommunications. The City argues that Dr. Ward does not need to be a real estate appraiser, broker, or agent to assert his opinions, and notes that BellSouth's own counter-expert is not a real estate appraiser, broker or agent. The City further notes that Dr. Ward has not nor has he ever set himself out as a legal expert. Finally, the City argues that many of BellSouth's challenges to Dr. Ward are improperly directed to Dr. Ward's conclusions. The City notes that a difference in opinions between the parties' experts does not render Dr. Ward's expert opinions outside the scope of *Daubert*.

The Court has considered the *Daubert* challenges raised by BellSouth regarding Dr. Ward's expert testimony, and the City's responses thereto. The Court finds that the challenges raised by BellSouth are more properly addressed through vigorous cross-examination and presentation of contrary evidence at trial, rather than through the present pre-trial Motion. A number of BellSouth's challenges to Dr. Ward's expert testimony relate to Dr. Ward's conclusions, and even more fail to demonstrate that Dr. Ward's testimony will meet the unreliability and/or irrelevancy standard of *Daubert* so as to require striking this testimony prior to trial. Furthermore, "most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury." *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000).

V.      **CONCLUSION**

For the foregoing reasons, Defendant BellSouth Telecommunications, Inc.'s Motion for Partial Summary Judgment on Claims in the Original Complaint (Rec. Doc. No. 47) is GRANTED IN PART and DENIED IN PART; Defendant BellSouth Telecommunications, Inc.'s

Motion for Partial Summary Judgment on Plaintiff City of New Orleans' First Amended

Complaint (Rec. Doc. No. 49) is GRANTED; Defendant BellSouth Telecommunications, Inc.'s

Motion  to Exclude Testimony of Plaintiff's Expert Dr. Bryce Ward (Rec. Doc. No. 48) is

DENIED; and Plaintiff City of New Orleans' Motion for Summary Judgment (Rec. Doc. No. 50)

is GRANTED IN PART and DENIED IN PART.


New Orleans, Louisiana, this 24th day of July, 2010.

ELDON E. FALLON
UNITED STATES DISTRICT JUDGE