## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **CITY OF NEW ORLEANS** | * | **CIVIL ACTION** |
| | * | |
| **VERSUS** | * | **NO. 09-151** |
| | * | |
| **BELLSOUTH TELECOMMUNICATIONS, INC.** | * | **SECTION "L"(5)** |

## FINDINGS OF FACT & CONCLUSIONS OF LAW

### PROCEDURAL HISTORY

This case arises out of the alleged failure on the part of Defendant BellSouth Telecommunications, Inc. ("BellSouth") to compensate Plaintiff City of New Orleans ("City") for BellSouth's use of the City's rights-of-way since 2007 to transmit its telecommunications services in New Orleans. The New Orleans City Council ("Council") intervened in the case as the body governing the issuance of franchise ordinances and rights-of-way. This case stems from a lengthy history of ordinances, jurisprudence, legislation and agreements, all involving BellSouth's use of the City's rights-of-way. As Justice Holmes taught us "a page of history is worth a volume of logic." *New York Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921). The "history" which the Court looks to in reaching its conclusions in the present case includes the following: Franchise Ordinance No. 4906 issued by the Council in 1879 ("1879 Franchise Ordinance"); Act 124 passed by the Louisiana Legislature in 1880 ("Act 124"); the Louisiana Supreme Court's 1888 decision in *City of New Orleans v. Great Southern Telephone & Telegraph Co.*, 3 So. 533 (La. 1888)("*Great Southern*"); an agreement in 1906 involving an offer by BellSouth to the City which was adopted by the Council, in whole or part ("1906

1

Agreement"); a letter sent by BellSouth to the Commissioner of Public Property in 1916 ("1916 Letter Agreement"); a settlement agreement in 1960 ("1960 Settlement Agreement"); a written proposal sent by BellSouth to the City in 1984 ("1984 Concession Agreement"); a settlement agreement in 1993 ("1993 Settlement Agreement"); the Ordinance of General Applicability issued by the Council in 1996 ("OGA"); a settlement agreement in 1998 ("1998 Settlement Agreement"); and a settlement agreement in 2001("2001 Settlement Agreement").

The present case comes to this Court by virtue of a suit filed by the City on January 20, 2009, in the Eastern District of Louisiana against BellSouth, seeking damages for outstanding compensation owed by BellSouth for BellSouth's use of the City's rights-of-way since 2007. The suit also seeks declaratory relief to establish the following: (1) the 1879 Franchise Ordinance has been breached by BellSouth, and thus the City may terminate this Ordinance, (2) the 1984 Concession Agreement is null and void, and (3) the OGA governs BellSouth's use of the City's rights-of-way, and thus, BellSouth is liable for all sums due to the City pursuant to the OGA.  Alternatively, the City asks that BellSouth be ordered to enter into a Louisiana Municipal Association ("LMA") Agreement with the City.

BellSouth filed an answer denying that it owes any outstanding compensation to the City and raising a number of affirmative defenses.  BellSouth contends that it has not breached the 1879 Franchise Ordinance since the compensation it pays annually pursuant to the 1984 Concession Agreement satisfies the consideration due under that Ordinance.  Additionally, BellSouth claims that the 1984 Concession Agreement is valid given that the City has accepted payment thereunder for a number of years.  BellSouth further claims that neither the OGA nor the LMA Agreement govern its use of the City's rights-of-way.

The Council filed a Complaint in Intervention essentially adopting the City's Complaint and requesting a declaration from the Court that the Council is the exclusive franchise authority in New Orleans.

BellSouth filed a Second Supplemental and Amended Answer and Counterclaim against the City. The Counterclaim seeks to require the City to reimburse BellSouth for all amounts paid by BellSouth to the City under Section 3.3 of the 2001 Settlement Agreement if the Court concludes that this Agreement is invalid. If this does occur, BellSouth additionally requests that the Court re-open the claims made in the 2000 litigation so as to allow BellSouth to seek reimbursement for all amounts paid to the City pursuant to the 1906 Letter Agreement.

This matter came on for trial without a jury on August 30, 2010. The Court has carefully considered the testimony of all of the witnesses and the exhibits entered into evidence during the trial, as well as the record. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court issues the following Findings of Fact and Conclusions of Law. To the extent that any finding of fact may be construed as a conclusion of law, the Court hereby adopts it as such and to the extent that any conclusion of law constitutes a finding of fact, the Court adopts it as such.

## FINDINGS OF FACT

### The Parties

(1)

The City is a political subdivision of the State of Louisiana and is governed by a home rule charter.

(2)

The Council is the legislative branch of the City.

(3)

BellSouth d/b/a AT&T Louisiana, is a Georgia corporation that provides telecommunications and internet services to customers in the City of New Orleans.

(4)

BellSouth is the successor in interest to each of the following: the New Orleans Telegraphic Exchange, Great Southern Telephone & Telegraph Company, Cumberland Telephone & Telegraph Company, Southern Bell Telephone & Telegraph Company, and South Central Bell Telephone Company.[1]

### 1879 Franchise Ordinance

(5)

On February 8, 1879, the Council adopted Ordinance No. 4906, the 1879 Franchise Ordinance, authorizing BellSouth to construct and maintain telephonic telegraph lines through the streets of the City of New Orleans.  (Joint Ex. 1).

(6)

The 1879 Franchise Ordinance provides that these lines are "to be constructed along such streets, at such points and in such manner as to the kind and position of the telegraph poles, the height of the wires above the streets, and in all other particulars as the Administrator of the Department of Improvements of this city may direct."  (Joint Ex. 1).

---

[1]All successors will be generally referred to as "BellSouth" for practical purposes.

4

(7)

In exchange for this authorization, the 1879 Franchise Ordinance requires BellSouth to "connect [its] wires with the Mayor's office, chief of police office and fire alarm telegraph office, and place and keep telephones therein, free of charge to the city."  (Joint Ex. 1).

(8)

Under the 1879 Franchise Ordinance, BellSouth's "acts and doings" are rendered "subject to any ordinance or ordinances that may hereafter be passed by the City Council." (Joint Ex. 1).

(9)

The 1879 Franchise Ordinance, since its inception, has authorized BellSouth to use the City's rights-of-way to construct and maintain its telecommunications lines.

(10)

BellSouth provided the free phone lines required by the 1879 Franchise Ordiance to the City until 1984 in exchange for its franchise rights pursuant to the Ordinance.  *See* (Joint Ex. 6).

**Act 124**

(11)

In 1880, the Louisiana State Legislature enacted Act 124.  (Joint Ex. 2).   Act 124 granted corporations formed "for the purpose of transmitting intelligence by magnetic telegraph or telephone or other system of transmitting intelligence, the equivalent thereof which may be hereafter invented or discovered" to "construct [and] maintain such telegraph, telephone or other lines necessary to transmit intelligence along all State, parish or public roads or public works."

*Id.*

(12)

Act 124 permits these lines "along the streets of any city, with the consent of the council or trustees thereof."  (Joint Ex. 2).

(13)

Act 124 is consistent with the 1879 Franchise Ordinance's grant of franchise rights to BellSouth.

### *Great Southern*

(14)

In December 1883, the Council passed an ordinance in an effort to regulate and control the erection and maintenance of telephone poles within certain of the City's rights-of-way by imposing a fee of five dollars per year, per pole.  *See City of New Orleans v. Great S. Telephone & Telegraph Co.*, 3 So. 533, 534 (La. 1888).

(15)

BellSouth failed to pay the fees for its telephone poles subject to the ordinance, and, as a result, the City filed suit seeking to enjoin BellSouth from using or maintaining said poles until BellSouth paid the outstanding fees.  *See id.*  This case, *City of New Orleans v. Great Southern Telephone & Telegraph Co.*, 3 So. 533 (La. 1888), reached the Louisiana Supreme Court.

(16)

The Louisiana Supreme Court characterized the fees required by the ordinance as "large additional consideration for the continued enjoyment of privileges already granted" to BellSouth

6

by the 1879 Franchise Ordinance.  *Id*. at 535.

(17)

The Court held that the grant of authority to BellSouth under the 1879 Franchise

Ordinance "constituted an irrevocable contract" which the City "is powerless to set [] aside or []

interpolate new or more onerous considerations therein."  *Id*.

(18)

The Court rejected the Council's authority to issue subsequent ordinances which "repeal,

destroy, or alter" the 1879 Franchise Ordinance's "essential features and considerations," and

held that the imposition of the pole fee constituted an "additional and burdensome consideration"

which was "not within the scope of the right reserved" in the 1879 Franchise Ordinance.  *Id*. at

535-36.

(19)

*Great Southern* affirmed BellSouth's right to utilize the City's rights-of-way for its

telecommunications lines free of consideration other than the provision of free telephone lines

required by the 1879 Franchise Ordinance.

(20)

*Great Southern* prevents the City from imposing additional consideration upon BellSouth

for BellSouth's franchise rights authorized by the 1879 Franchise Ordinance.

**1906 Agreement**

(21)

On March 8, 1906, BellSouth sent a letter to the Mayor of New Orleans and the Council

in response to an inquiry from the City as to whether BellSouth would be willing to pay the City

"a considerable sum per annum for the use of the streets of the City."  (Joint Ex. 3).

(22)

In this letter, BellSouth acknowledged the great benefit conferred to it by the 1879

Franchise Ordinance, but stated it "cannot [] make any payment or contribution to the City as a

consideration for [the] grant already acquired [by the 1879 Franchise Ordinance]."  (Joint Ex. 3).

(23)

However, "recognizing the fact that the grant has by reason of the great development of

the telephone business proved to be of great benefit to [BellSouth]," BellSouth offered to pay to

the City three percent "of its gross receipts from rentals paid by telephone subscribers for rental

of telephones in the City of New Orleans, so long as [BellSouth] is alone operating in the city."

(Joint Ex. 3).

(24)

BellSouth also wrote, "[s]hould any other person or company acquire the right to conduct

a telephone exchange or business in the City, [BellSouth] would not feel justified in continuing

its payments, and would cease to make them."  (Joint Ex. 3).

(25)

In response to BellSouth's letter, the Council accepted BellSouth's offer to pay the City

three percent of the gross receipts from rentals with the reservation that this acceptance "shall in

no wise constitute a contract between [BellSouth] and the [City], or bind [the City] to hereafter

grant no other privileges for the use of streets in connection with the telephone business."  (Joint

Ex. 4).

(26)

BellSouth has paid the City the compensation included in the offer and acceptance of the 1906 Agreement despite the Council's refusal to provide BellSouth exclusivity. *See* (Abbott Test. Vol. II, 267:19-24; 285:4-16, Aug. 31, 2010); (Cangelosi Dep. 16:7-17:5, Aug. 24, 2010); (Mendoza Test. Vol. I 75:12-76:1, Aug. 30, 2010); (Ponder Test. Vol. II, 259:16-21, 263:23-264:5, Aug. 31, 2010); (Avera Test. Vol. II, 340:22-341:5, Aug. 31, 2010).

(27)

Because the Council did not adopt BellSouth's request that it be the exclusive provider of telecommunications services in the City, the payments made by BellSouth to the City pursuant to the 1906 Agreement constituted compensation for some benefit other than exclusivity.  This is supported by the evidence demonstrating that BellSouth paid the City the three-percent even after competition entered the telecommunications market as early as 1973, (Abbott Test. Vol. II, 285:4-16, Aug. 31, 2010), the divestiture occurred in 1980s, (Cangelosi Dep. 16:7-17:5, Aug. 24, 2010), and competition became more prevalent in the telecommunications market in New Orleans in the 1990s, posing an increasing concern to BellSouth.  (Mendoza Test. Vol. I 75:12-76:1, Aug. 30, 2010); (Ponder Test. Vol. II, 259:16-21, 263:23-264:5, Aug. 31, 2010)(Abbott Test. Vol. II, 267:19-24); (Avera Test. Vol. II, 340:22-341:5, Aug. 31, 2010).  The first time BellSouth challenged the 1906 Settlement Agreement based upon exclusivity was in 2000, when it filed a counter-claim in the lawsuit brought by the City which eventually resulted in the 2001 Settlement Agreement.  (Joint Ex. 20).

9

(28)

The three-percent payment was in exchange for a benefit in addition to and separate from the franchise right BellSouth received under the 1879 Franchise Ordinance.  The City contends that the three-percent payment was for BellSouth's right to use subsurface space, a new right not conferred by the 1879 Franchise Ordinance.  BellSouth disputes this position, arguing that the three-percent payment was for the right to be the exclusive telecommunications provider in New Orleans.  The evidence supporting each position is either non-existent or at best unclear.

(29)

Because the evidence is inconclusive as to the exact benefit conferred to BellSouth pursuant to the 1906 Agreement, the Court finds that BellSouth agreed to the three-percent payments in recognition of the "great benefit" derived from the 1879 Franchise Ordinance, but not directly to expand the franchise right granted by that Ordinance.  *See* (Joint Ex. 3).

(30)

Nonetheless, BellSouth voluntarily entered into the agreement with the City to pay the three-percent sum.  (Avera, Test. Vol. II, 338:12-21).

(31)

Although the three-percent payments made pursuant to the 1906 Agreement were initially taken from BellSouth's revenues from telephone rentals, at some point the three-percent instead began to apply to BellSouth's revenues from certain local telephone service.  (Abbott Test. Vol. II, 288:1-12); (Thompson Test. Vol. II, 315:4-12, Aug. 31, 2010).

(32)

There have been a number of disputes between the parties over the years as to the proper

amounts owed by BellSouth to the City pursuant to the 1906 Agreement. *See* (Joint Exs. 7, 10, 12). These disputes involve which revenues the three-percent payment is to apply and exactly what was it for. *See id.*

(33)

In 2000, the last year the 1906 Agreement was in effect, the City received approximately $3.9 million from BellSouth pursuant to the 1906 Agreement. (Foster Test. Vol. I, 117:13-20, Aug. 30, 2010).

(34)

The payments from BellSouth to the City pursuant to the 1906 Agreement were never passed to BellSouth's customers through their telephone bills. (Avera Test. Vol. II, 349:18-24).

**1916 Letter Agreement**

(35)

On January 28, 1916, BellSouth sent a letter to the New Orleans Commissioner of Public Property which confirmed a previous conversation involving BellSouth, the Commissioner, the Mayor of New Orleans, and an unidentified "Judge Moore." (Joint Ex. 5).

(36)

In this letter, BellSouth agreed to provide at a discounted rate, 33-1/3% off, all of the City's current and future telephone service. (Joint Ex. 5); *see* (Cangelosi Dep. 14:12-25).

(37)

BellSouth also wrote in the letter "[i]n addition to the three free telephones which [it] furnishes to the City under its franchise obligation, [BellSouth] agrees to give to the City of New

11

Orleans twenty-five additional telephones, free of charge."  (Joint Ex. 5); (Cangelosi Dep. 14:12-25).

(38)

BellSouth complied with its obligations pursuant to the 1916 Letter Agreement as long as it owned the phones and had the capacity to provide them.

(39)

However, the evidence is not clear as to the benefit, if any, that was conferred upon BellSouth for its provision of discounted and free telephone service to the City under the 1916 Letter Agreement.

**1984 Concession Agreement**

(40)

In 1984, the divestiture of AT&T went into effect as result of a settlement of an anti-trust suit brought by the Department of Justice against AT&T.  *See generally* (Cangelosi Dep. 15:14-17:5).  The divestiture broke-up AT&T into a number of small companies, including BellSouth. *Id.*

(41)

As a result of the divestiture, BellSouth no longer owned or was able to provide telephone equipment to its customers.  (Cangelosi Dep. 17:6-9); (Ponder Test. Vol. II, 204:16-205:2); (Avera Test. Vol. II, 342:23-343:13).  This had an effect on the agreements between BellSouth and the City in which BellSouth was obligated to provide free telephones to the City, namely the 1879 Franchise Ordinance and the 1916 Letter Agreement.  (Cangelosi Dep. 17:13-

16).

(42)

The parties entered into an agreement in 1984 to solve this problem.  In this agreement, the 1984 Concession Agreement, BellSouth offered to pay a lump sum of $417,285.18, the City's budgetary deficit for one year on the equipment portion of the concession, in exchange for the City's agreement to cap the lines and services portion of the concession at $31,407.21 monthly.  (Joint Ex. 6).

(43)

On December 6, 1984, BellSouth sent a letter to the Mayor of New Orleans at the time, Ernest "Dutch" Morial, containing a proposal made in response to the recent divestiture of the BellSouth system and its effect upon the existing concession given by BellSouth to the City. (Joint Ex. 6).

(44)

The letter also provided "that the proposal agreed to hereby is an amendment solely to the letter agreement dated January 28, 1916," and "nothing herein shall be deemed to affect, or be construed to restrict...those fees, charges or payments required by...[the 1879 Franchise Ordinance]." (Joint Ex. 6).

(45)

The evidence at trial demonstrated that the consideration due pursuant to the 1879 Franchise Ordinance (the free telephone lines) and the consideration due pursuant to the 1916 Agreement (the additional free telephones) were monetized by the 1984 Concession Agreement, as necessitated by the divestiture.  (Cangelosi Dep. 20:21-21:6; 34:10-21; 36:3-5; 37:7-44:3;

48:7-14; 49:10-50:5; 65:1-67:19); (Ponder Test. 204:3-15).

(46)

BellSouth has and continues to remit payments to the City pursuant to the 1984 Concession Agreement in the amount of $376,886.52 annually.  *See* (Joint Ex. 19).

(47)

The payments BellSouth has made and is currently making at the present time to the City pursuant to the 1984 Concession Agreement satisfy the consideration due under the 1879 Franchise Ordinance and the 1916 Letter Agreement.  *See* (Cangelosi Dep. 20:21-21:6; 34:10-21; 36:3-5; 37:7-44:3; 48:7-14; 49:10-50:5; 65:1-67:19); (Ponder Test. 204:3-15).

**OGA**

(48)

In June 1996, the Council issued Ordinance No. 17,560, the Ordinance of General Applicability ("OGA").  (Joint Ex. 8).

(49)

The OGA enacted the Wireline Telecommunications Franchise Act in New Orleans to provide for uniform procedures, terms, conditions and compensation for telecommunications franchises which utilize the City's rights-of-way.  (Joint Ex. 8).

(50)

The OGA generally applies to occupants of the City's rights-of-way who install, maintain, repair, and/or operate wireline telecommunications systems.  (Joint Ex. 8).

14

(51)

The OGA distinguishes between occupants seeking new franchises and those with pre-existing franchises.  (Joint Ex. 8).

(52)

With regard to pre-existing franchises, the OGA provides "pre-existing franchises shall remain subject to all existing provisions of such pre-existing franchises," and such pre-existing franchises do not become subject to the OGA unless and until they are renewed.  (Joint Ex. 8). However, the OGA automatically applies to pre-existing franchises which contain an acknowledgment of susceptibility to an ordinance of general application or general applicability. *Id*.

(53)

BellSouth's franchise rights pursuant to the 1879 Franchise Ordinance pre-existed the OGA and are not subject to an express termination or renewal period.  *See* (Joint Ex. 1).  Nor does the 1879 Franchise Ordinance contain an acknowledgment of susceptibility to an ordinance of general application or general applicability.  *See id.*

(54)

At a New Orleans City Council meeting on June 6, 1996, a statement was made that the passage of the OGA would have no effect upon BellSouth's obligation to pay the three-percent fee under the 1906 Agreement.  *See* (Joint Ex. 9)

(55)

Additionally, a series of correspondence between the Council and BellSouth during 2001 and 2002 indicate that the OGA does not govern BellSouth's use of the City's rights-of-way.

15

*See* (Def.'s Exs. 5, 6,7).

## 1998 Settlement Agreement

(56)

In January 1996, the City initiated a review of BellSouth's accounting under the 1906 Agreement for the years 1985 to 1995, and based thereon alleged that BellSouth had underpaid the City $17,358,073.00. *See* (Joint Ex. 10).

(57)

The City demanded compensation for the underpayment which resulted in the Partial Compromise and Mutual Agreement for Credit Payment on August 3, 1998, whereby BellSouth paid the City $2,500,000.00. (Joint Exs. 10, 11).

(58)

The 1998 Settlement Agreement resolved a dispute between the parties as to which of BellSouth's revenue streams were subject to the three-percent payments required by the 1906 Agreement. (Joint Ex. 10).

(59)

The 1998 Settlement Agreement recognized the validity of the 1879 Franchise Ordinance and the 1906 Agreement. (Joint Ex. 10).

2001 Settlement Agreement

(60)

However, the 1998 Settlement Agreement did not end the disputes between these parties.

On January 20, 2000, the City claimed that BellSouth owed an additional $7,250,983.00 under

the 1906 Agreement for the years 1997 and 1998.  *See* (Joint Ex. 20).

(61)

Because BellSouth refused to pay this sum, the City filed suit against BellSouth on July

25, 2000, to recover the outstanding compensation due under the 1906 Agreement and to obtain

a declaration that all future payments under the 1906 Agreement be based upon three percent of

all of BellSouth's gross receipts generated within the City.  (Joint Ex. 20).

(62)

BellSouth filed an Answer and Counterclaim, (1) denying liability, (2) seeking a

declaration that the 1906 Agreement was terminated since BellSouth was no longer the exclusive

provider of telecommunications services within the City, and (3) seeking a return of all payments

made after BellSouth was no longer the exclusive provider.  (Joint Ex. 20).

(63)

BellSouth and the City resolved the litigation by entering into the 2001 Settlement

Agreement.  (Joint Ex. 12).

(64)

On November 1, 2001, the Council ratified and approved the 2001 Settlement Agreement

with Ordinance No. 20,477.  (Joint Ex. 14).

(65)

The 2001 Settlement Agreement recognized BellSouth's franchise rights deriving from

the 1879 Franchise Ordinance, as confirmed by the Louisiana Supreme Court in *Great Southern*,

17

and provided that the City is not entitled to seek additional compensation or consideration from BellSouth thereunder.  (Joint Ex. 12).


(66)

The 2001 Settlement Agreement also recognized that "because other persons or companies have acquired the right to conduct a telephone exchange or business in the City, the 1906 Agreement has terminated."  (Joint Ex. 12).

(67)

The 2001 Settlement Agreement required BellSouth to pay to the City a fixed, annual amount of $5,500,000.00 for six years, terminating in January 2006.  (Joint Ex. 12).  BellSouth has fulfilled this obligation.  *See* (Zeno Dep. 36:7-9, 43:3-7, Jan. 12, 2010).  BellSouth has not made any payments to the City since 2006 other than the payments required by the 1984 Concession Agreement.  *See* (Zeno Dep. 40:9-41:2, 43:3-7).

(68)

In the 2001 Settlement Agreement, "BellSouth and the City [] mutually release[d] and discharge[d] each other from all claims, actions, causes of action, and disputes whether known or unknown, asserted or unasserted, that in any way concern the 1879 [Franchise] Ordinance, the 1906 Agreement, or the [1984] Concession Agreement."  (Joint Ex. 12).  The Agreement was "intended to fully and completely compromise, settle and finally terminate all of the disputes, claims and causes of action by and between BellSouth and the City."  (Joint Ex. 12); *see* (Ponder Test. Vol. II, 202:13-203:8).  Nevertheless, in the present matter, the City has raised the following claims involving the 1879 Franchise Ordinance, the 1906 Agreement, and the 1984

18

Concession Agreement: (1) the 1879 Franchise Ordinance has been breached since BellSouth has not provided the free phone service required therein, (2) the 1879 Franchise Ordinance applies only to BellSouth's above-ground use of the City's rights-of-way, and (3) the 1984 Concession Agreement is null and void.  *Id.*

(69)

The 2001 Settlement Agreement recognized the existence and validity of the 1984 Concession Agreement and included the 1984 Concession Agreement as an attachment.  (Joint Ex. 12).

(70)

The 2001 Settlement Agreement recognized BellSouth's continuing obligation to pay the City the amounts due pursuant to the 1984 Concession Agreement.  (Joint Ex. 12); (Ponder Test. Vol. II, 206:21-23).  BellSouth has continued to fulfil its obligation to pay these amounts. (Thompson Test. Vol. II, 300:7-23).

(71)

The 2001 Settlement Agreement contained two alternative methods for BellSouth to compensate the City post-2006.  (Joint Ex. 12); (Ponder Test. Vol. II, 216:2-5, 222:3-16).  The first method was the passage of the Simplified Tax Legislation.  *Id.*  The second method was the enactment of the LMA Agreement.  *Id.*

(72)

The 2001 Settlement Agreement provides that the Mayor at the time of the Agreement was required to "publicly support and actively work towards" the passage of the Simplified Tax Legislation.  (Joint Ex. 12).  However, if the Legislation was not enacted by January 2007,

19

during the 2007 calendar year the Agreement permitted the City to elect to enter into the LMA

Agreement by ordinance.  *Id*.

(73)

The City made efforts towards passage of the Simplified Tax Legislation.  (Zeno Dep.

72:14-74:10).  However, this Legislation did not pass by January 2007, nor ever.  (Zeno Dep.

27:7-10); (Abbott Test. Vol. II 279:17-18).

(74)

Nor did the City enact the LMA agreement within the 2007 calendar year.  (Zeno Dep.

27:11-14).  The City chose not to enter the LMA agreement after learning that the revenues it

would receive thereunder would be significantly less than the revenues it was currently receiving

under the 2001 Settlement Agreement and had received under the 1906 Agreement.  (Zeno Dep.

27:15-21, 64:15-65:4); (Tervalon Test. Vol. 141:8-12); (Avera Test. Vol. II, 345:16-346:16).

(75)

The 2001 Settlement Agreement contains no requirement that the Simplified Tax

Legislation pass or that the City enter into the LMA Agreement, *see* (Joint Ex. 12); nor was the

2001 Settlement Agreement conditioned on these terms.  (Ponder Test. Vol. II, 249:23-251:4).

(76)

The inclusion of the Simplified Tax Legislation and LMA Agreement provisions in the

2001 Settlement Agreement indicates that the parties contemplated that BellSouth would

continue to compensate the City for its use of the City's rights-of-way, or a related right, post-

2006.  (Tr. Vol. I 159:6-9); (Joint Ex. 21, Findings of Fact and Conclusions of Law, p. 45);

(Ponder Test. Vol. II, 215:12-20, 222:3-16, 255:13-24 ); (Abbott Test. 289:19-22); (Zeno Dep. 26:15-21).

(77)

In 2000, the last year before the 1906 Agreement was terminated by the 2001 Settlement Agreement, BellSouth paid the City approximately $3.9 million pursuant to the 1906 Agreement. (Foster Test. Vol. I, 117:13-20).

(78)

BellSouth has not paid the City any sums since 2006 other than the $376,844.00 annually pursuant to the 1984 Concession Agreement.  *See* (Zeno Dep. 40:9-41:2, 43:3-7).  However, BellSouth has continued to enjoy the same benefits related to its use of the City's rights-of-way since 2006, earning approximately $120 million annually.  *See e.g.* (Tervalon Test. Vol. I, 141:13-16, 142:2-4, Aug. 30, 2010).  Thus, BellSouth has continued to profit from its use of the City's rights-of-way, but has paid substantially less for this benefit.

**Post-2006**

(79)

There exists no valid, enforceable agreement between the parties which governs compensation post-2006, other than the 1984 Concession Agreement, since the compensation terms of the 2001 Settlement Agreement have either lapsed due to non-fulfillment of conditions or ceased due to fixed periods of time.

21

(80)

BellSouth's use of the City's rights-of-way and the benefits ancillary to this use have not changed post-2006.

## CONCLUSIONS OF LAW

### Jurisdiction

(81)

This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.  Plaintiff, the City, is a political subdivision of the State of Louisiana.  *See Band v. Audubon Park Comm'n*, 2005-0937 (La. App. 4 Cir. 7/12/06); 936 So. 2d 841, 845.  Intervenor, the Council, is the legislative branch of the City.  *See* New Orleans, La., Home Rule Charter, art. III, § 3-101(1)(2009).  Defendant, BellSouth, is a Georgia corporation with its principal place of business in Atlanta, Georgia.  *See* Compl.  The amount in controversy exceeds $75,000, exclusive of interest and costs.  *Id.*

### Applicable Law

(82)

Because the Court has subject matter jurisdiction based upon diversity of the parties, the substantive law of Louisiana is the applicable law.  *See Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938).

(83)

The City is governed by its Home Rule Charter.  *See Fransen v. City of New Orleans*, 988 So. 2d 225, 234-35 (La. 2008).

(84)

Franchises in which the government or public has an interest are to be construed strictly in favor of the public.  *Broad River Power Co. v. State of S. Carolina,* 281 U.S. 537, 543(1930); *Coosaw Mining Co. v. State of N. Carolina*, 144 U.S. 550, 561-62 (1892); *State v. Carondelet Canal & Navigation Co.*, 129 La. 279, 323 (La. 1910)(Monroe, J. concurring), *rev'd on other grounds*, 233 U.S. 362 (1914).

(85)

Under Louisiana law, the statutory and jurisprudential rules for the construction and interpretation of state statutes are applicable to the construction and interpretation of municipal ordinances.  *Sellers v. City of New Iberia*, 94-1042, p.1 (La. App. 3 Cir. 2/1/95); 649 So. 2d 1212, 1213; *Lieber v. Rust*, 388 So. 2d 836 (La. Ct. App. 1980), *aff'd*, 398 So. 2d 519 (La. 1981); *Louisiana Television Broad. Corp. v. Total C.A.T.V.*, 341 So. 2d 1183 (La. Ct. App. 1976), *writ refused*, 343 So. 2d 1076 (La. 1977).  The Louisiana Supreme Court has provided the following guidance to courts in interpreting statutes,

> As the fundamental question in all cases of statutory interpretation is legislative intent, the rules of statutory construction are designed to ascertain and enforce the intent of the Legislature.  One determines the meaning and intent of a law 'by considering the law in its entirety and all other laws on the same subject matter and by placing a construction on the law that is consistent with the express terms of the law and with the obvious intent of the legislature in enacting the law.'  A statute must be applied and interpreted in a manner that is logical and consistent with the presumed fair purpose and intent of the Legislature in enacting it.  The text of the law is the best evidence of legislative intent.

> Words and phrases must be read with their context and construed according to common and approved usage of the language.  'The word 'shall' is mandatory and the word 'may' is permissive.'  Further, every word, sentence, or provision in a law is presumed to be intended to serve some useful purposes, that some effect is given to each such provision, and that no unnecessary words or provisions were employed.  Consequently, courts are bound, if possible, to give effect to all parts of a statute and to construe no sentence, clause of word as meaningless and surplusage if a construction giving force to and preserving all words can legitimately be found.  *Black v. St. Tammany Parish Hops*., 25 So. 3d 711, at *9-10 (La. 2009)(internal citations omitted).

23

Furthermore, "when the language of a statute is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law.  When a statute is ambiguous...the letter must give way to the spirit of the law and the statute construed to produce a reasonable result." *Red Stick Studio Dev., LLC v. State of La.*, 2009-1347, p.5 (La. App. 1 Cir. 12/23/09); 30 So. 2d 803.

(86)

Under Louisiana law "[i]nterpretation of a contract is the determination of the common intent of the parties." La. Civ. Code art. 2045.  "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La Civ. Code art. 2046.  A court looks to extrinsic evidence "only when a contract is found to be ambiguous after an examination of the four corners of the agreement, or when it is susceptible to more than one interpretation, or the intent of the parties cannot be ascertained." *Perkins v. Entergy Corp*., 2009-0632, p.8 (La. App. 1 Cir. 6/10/10); 2010 WL 2332357 (citing *Sanders v. Ashland Oil, Inc*., 96-1751(La. App. 1 Cir. 6/20/97); 696 So. 2d 1031, 1036).  "The intent behind a contract is an issue of fact that is to be inferred from all of the surrounding circumstances, including the conduct of the parties before and after the formation of the contract. *Spohrer v. Fore*, 2009-1295 (La. App. 1 Cir. 6/11/10); 2010 WL 2342658 (citing *Naquin v. La. Power & Light Co.*, 2005-2103 (La. App. 1 Cir. 9/15/06); 943 So. 2d 1156, 1164).

(87)

"All legislative powers of the City shall be vested in the Council and exercised by it in the manner and subject to the limitation [] set forth [in the Home Rule Charter."  New Orleans,

La., Home Rule Charter, art. III, § 3-101(1).  "Every act of the Council which is to become law shall be by ordinance..."  *Id*. at § 3-111.  "The Council shall have the power to grant franchises...for the use of the streets and other public places for the furnishing of any service to the City or its inhabitants subject to applicable state or municipal law.  All franchises...shall be granted only by ordinance."  *Id*. at § 3-128(1).

### 1879 Franchise Ordinance

(88)

The 1879 Franchise Ordinance remains a valid, enforceable ordinance since it has not been revoked or otherwise amended by the Counsel and its validity has been recognized in subsequent jurisprudence, ordinances and agreements, including, but not limited to, *Great Southern*, the 1906 Agreement, the 1984 Concession Agreement, and the 2001 Settlement Agreement.

(89)

Act 124 permitted telephone companies such as BellSouth to use the City's rights-of-way, with consent of the Council, in order to construct and maintain telephone lines without imposing a specific method of compensation therefor.  This is consistent with the rights granted to BellSouth in the 1879 Franchise Ordinance.

(90)

The Louisiana Supreme Court's decision in *Great Southern* precludes the City from imposing new or more onerous considerations upon BellSouth for the rights granted to BellSouth under the 1879 Franchise Ordinance.  *See Great Southern*, 3 So. 533 (La. 1888).

(91)

The 2001 Settlement Agreement confirmed the validity of *Great Southern* as it applies to BellSouth's franchise rights granted pursuant to the 1879 Franchise Ordinance.

(92)

Another section of this Court has contemporaneously recognized the continuing validity of *Great Southern*. *See Broussard v. South Cent. Bell*, 1992 WL 96304, at *6 (E.D. La. Apr. 30, 1992).

(93)

Based upon the foregoing, the City is precluded from imposing additional consideration upon BellSouth for its franchise rights acquired pursuant to the 1879 Franchise Ordinance other than as modified by mutual agreement of the parties.

**1906 Agreement**

(94)

The 1906 Agreement created a valid obligation between the parties whereby BellSouth was required to pay the City three-percent of its gross receipts from telephone rentals in New Orleans in exchange for some indeterminate benefit, independent of the franchise rights conferred by the 1879 Franchise Ordinance.

(95)

The 1906 Agreement did not grant BellSouth the right to be the sole telephone company operating in the New Orleans. *See* (Joint Ex. 4).

(96)

The 1906 Agreement did not constitute a franchise ordinance, and thus, it did not grant

BellSouth franchise rights for underground use of the City's rights-of-way.  *See* (Joint Ex. 4).

(97)

The 1906 Agreement did not provide a clear benefit to BellSouth; nonetheless, this

agreement constituted a valid obligation.  *See* La. Civ. Code arts. 1907, 1910, 1971.

(98)

BellSouth fulfilled its obligations under the 1906 Agreement.

**1916 Letter Agreement**

(99)

The 1916 Letter Agreement obligated BellSouth to provide to the City a discount on all

current and future telephone service, as well as twenty-five free telephones.

(100)

The 1916 Letter Agreement did not provide a clear benefit to BellSouth; nonetheless, this

agreement constituted a valid obligation.  *See* La. Civ. Code arts. 1907, 1910, 1971.

(101)

BellSouth fulfilled its obligations under the 1916 Letter Agreement.

**1984 Concession Agreement**

(102)

The 1984 Concession Agreement constitutes a valid agreement between the parties and modified the consideration provisions in the 1879 Franchise Ordinance and the 1916 Letter Agreement which required BellSouth to provide free telephone lines and discounted telephone service to the City.

(103)

Although the 1984 Concession Agreement was not initially ratified by the Council, it constitutes a valid obligation between the parties since it was ratified by its inclusion in the 2001 Settlement Agreement which was ratified by the Counsel. *See* New Orleans, La., Home Rule Charter § 3-128(1); *Jackson v. McCullen*, 05-1132 (La. App. 3 Cir. 3/8/06); 924 So. 2d 1236, 1240.

(104)

Additionally, since the City has accepted the payments remitted by BellSouth pursuant to the 1984 Concession Agreement prior to its ratification in the 2001 Settlement Agreement, the City is estopped from arguing the 1984 Concession Agreement is invalid and unenforceable. The Fifth Circuit characterizes the Louisiana Supreme Court's definition of equitable estoppel as "the effect of the voluntary conduct of a party whereby he is precluded from asserting rights against another who has justifiably relied upon such conduct and changed his position so that he will suffer injury if the former is allowed to repudiate the conduct." *Taita Chem. Co, Ltd. v. Westlake Styrene Corp.*, 246 F.3d 377, 389 (5th Cir. 2001)(quoting *Morris v. Friedman*, 663 So. 2d 19, 25 (La. 1995)). Furthermore, equitable estoppel may, in proper circumstances, prevent a party from taking a position contrary to its prior acts, admissions, representations, or silence. *Id.* Equitable estoppel has three elements, (1) a representation by conduct or work, (2) justifiable

reliance thereon, and (3) a change in position to one's detriment because of the reliance. *Id.*

In the present case, the City represented to BellSouth that the 1984 Concession Agreement was a valid agreement and accepted compensation from BellSouth pursuant to the Agreement. BellSouth relied upon this representation, and as a result, BellSouth paid monetized compensation to the City, instead of providing free telephones, under the Agreement. If the 1984 Concession Agreement was declared void, BellSouth would suffer harm due to the loss of the substantial compensation it has paid to the City pursuant to the 1984 Concession Agreement, and the risk that the 1879 Franchise Ordinance would be rendered void for BellSouth's failure to satisfy the consideration required thereunder. Thus, the City cannot now argue that the 1984 Concession Agreement is invalid.

(105)

The Court's previous finding in its Order & Reasons of July 26, 2010, (R. 143) that the 1984 Concession Agreement had no effect upon and was independent of the 1879 Franchise Ordinance is withdrawn based upon the evidence introduced at trial. *See* (Cangelosi Dep. 20:21-21:6; 34:10-21; 36:3-5; 37:7-44:3; 48:7-14; 49:10-50:5; 65:1-67:19); (Ponder Test. 204:3-15). Accordingly, BellSouth's Motion for Reconsideration (R. 153) is GRANTED.

(106)

BellSouth has not breached its obligations under the 1879 Franchise Ordinance, the 1916 Letter Agreement, or the 1984 Concession Agreement since it has and continues to pay the consideration required by the 1984 Concession Agreement which monetized the free telephone consideration required by the 1879 Franchise Ordinance and 1916 Letter Agreement.

(107)

Since BellSouth has not breached the 1879 Franchise Ordinance, the City has no right to terminate this Ordinance.

## OGA

(108)

The OGA does not govern BellSouth's franchise rights pursuant to the 1879 Franchise Ordinance since this Ordinance pre-existed the enactment of the OGA and does not contain an acknowledgment of susceptibility to the OGA.  *See* (Joint Ex. 8).

(109)

The OGA does not apply to govern compensation between the parties post-2006 since the benefit for which BellSouth owes the City compensation for this time period is solely rooted in BellSouth's benefits arising from the 1906 Agreement which did not grant BellSouth any franchise rights.

(110)

Even if the compensation BellSouth owes to the City post-2006 did arise from a franchise right of BellSouth, there was no evidence presented that indicated the franchise right arose after the OGA or arose prior to the OGA but contained an acknowledgment of susceptibility to the OGA.

## 2001 Settlement Agreement

(111)

The 2001 Settlement Agreement is a valid agreement between the parties.  *See City of Shreveport v. SGB Architects, LLP*, 45,458, p. 3 (La. App. 2 Cir. 9/22/10); 2010 WL 3663274, at

*2 ("Under Louisiana law, the formation of a valid and enforceable contract requires capacity, consent, a certain object and lawful cause").

(112)

The 2001 Settlement Agreement terminated the 1906 Agreement.  *See* La. Civ. Code art. 2046.

(113)

The 2001 Settlement Agreement precludes the City from raising arguments involving the 1879 Franchise Ordinance, the 1906 Agreement, and the 1984 Concession Agreement since any issues arising from these documents were compromised in the 2001 Settlement Agreement.  *See* La. Civ. Code art. 3017; La Civ. Code art. 3080; *Young v. Equifax Credit Info. Servs., Inc.*, 294 F.3d 631, 637 (5th Cir. 2002).  This includes all disputes, claims and causes of action arising from these documents, whether known or unknown, asserted or unasserted.  *See id.*

(114)

Thus, the Court is precluded from entertaining the City's requests for declaratory judgment pertaining to these documents.  *See id.*  These requests include declarations that, (1) the 1879 Franchise Ordinance has been breached by BellSouth, and (2) that the 1984 Concession Agreement is null and void.

(115)

Whether the payments BellSouth has remitted to the City pursuant to the 1984 Concession Agreement are sufficient to compensate the City for the payments due under the 1879 Franchise Ordinance and the 1916 Letter Agreement is an issue resolved by the 2001

Settlement Agreement.  *Id*.  Thus, the Court need not determine the number of telephones, telephone lines, and offices which were entitled to free telephone service pursuant to the earlier agreements.

(116)

Whether the 1879 Franchise Ordinance granted BellSouth franchise rights for both above and below-ground use of the City's rights-of-way, or solely above-ground use is an issue also resolved by the 2001 Settlement Agreement.  (Joint Ex. 12); *see* (Ponder Test. Vol. II, 202:13-203:8).  Additionally, the City's argument that the 1906 Agreement conveyed BellSouth the right to underground use of the City's rights-of-way is barred by the Agreement, and as noted above, not supported by the evidence.  *See supra* (28), (29).  Thus, the Court need not determine the extent of the use of the rights-of-way granted by the 1879 Franchise Ordinance.

(117)

The 2001 Settlement Agreement established a specific method of payment between the parties until 2006 which required BellSouth to pay the City $5,500,000.00 annually.  BellSouth has fulfilled this obligation.

(118)

The 2001 Settlement Agreement acknowledged BellSouth's continuing obligation to make payments to the City pursuant to the 1984 Concession Agreement.

(119)

As further consideration for the 2001 Settlement Agreement, (1) the Mayor of New Orleans at the time of the Agreement was required to publicly support and actively work towards

32

the passage of the Simplified Tax Legislation, and (2) if the Simplified Tax Legislation did not

pass by January 2007, the City was permitted to enact via ordinance, the LMA Agreement during

2007.  The inclusion of these "further consideration" provisions in the 2001 Settlement

Agreement indicated that the parties contemplated compensation would be paid by BellSouth to

the City post-2006 in addition to BellSouth's payments to the City pursuant to the 1984

Concession Agreement.

(120)

Because the conditions were not met for the Simplified Tax Legislation and the LMA

Agreement to be enacted, these methods of compensation cannot form the basis of compensation

between the parties post-2006.  *See* La. Civ. Code art. 1767; *Jackson v. Lare*, 34,124 (La. App. 2

Cir. 11/1/00); 779 So. 2d 808, 816.

(121)

However, the failure of the conditions of these provisions to be satisfied does not

foreclose the City from receiving compensation from BellSouth post-2006 for the benefits

BellSouth has enjoyed and continues to enjoy which were granted originally in the 1906

Agreement.  The 2001 Settlement Agreement does not contain language indicating the

Simplified Tax Legislation and the LMA Agreement provisions are the exclusive methods of

compensation post-2006.  Rather, these provisions contain permissive language indicating the

parties' intent to leave open the possibility of other forms of compensation between the parties.

*See* La. Rev. Stat. § 1:3 ("The word 'shall' is mandatory and the word 'may' is permissive").  The

evidence presented at trial also supports this conclusion.

**Post-2006**

(122)

Since no agreed upon method of payment has been in place from 2006, the doctrine of unjust enrichment must be used to define the extent of BellSouth's obligation to pay the City for the benefits it has been receiving post-2006 which originally derived from the 1906 Agreement and later were recognized in the 2001 Settlement Agreement.

(123)

Louisiana Civil Code article 2298 codifies the Louisiana doctrine of unjust enrichment as follows,

> A person who has been enriched without cause at the expense of another person is bound to compensate that person.  The term "without cause" is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law.  The remedy declared here is subsidiary and shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule.

The Fifth Circuit has broken down the elements of unjust enrichment into, (1) enrichment on the part of the defendant, (2) impoverishment on the part of the plaintiff, (3) a causal connection between the defendant's enrichment and the plaintiff's impoverishment, (4) an absence of justification or cause for the enrichment and impoverishment, and (5) a lack of other remedy at law.  *Richard v. Wal-mart Stores, Inc.,* 559 F.3d 341, 346 (5th Cir. 2009)(quoting *Minyard v. Curtis Prods. Inc*., 205 So. 2d 422, 432 (La. 1968)); *Bank of Abbeville & Trust Co. v. Commonwealth Land Title Ins. Co.*, 201 Fed. App'x 988, 991 n.1 (5th Cir. 2006); *see also McCullum v. McAlister's Corp. of Miss.*, 2010 WL 2651623, at *3 (E.D. La. June 28, 2010).

(124)

The elements of unjust enrichment have been satisfied in the present matter.  First,

34

BellSouth has been enriched since 2006 through its continued enjoyment of benefits stemming from its use of the City's rights-of-way.  Second, the City has been impoverished by BellSouth's enjoyment since it has not been compensated for such, although it previously was compensated for this enjoyment under the 1906 Agreement and the 2001 Settlement Agreement; furthermore, it was contemplated that the City would be compensated post-2006 by BellSouth through the Simplified Tax Legislation, the LMA Agreement, or some other method.  Third, there is a connection between BellSouth's enjoyment of benefits and the City's impoverishment due to BellSouth's cessation of payments for this enjoyment after over a hundred years.  Fourth, there is no justification for BellSouth's failure to compensate the City post-2006 since the parties contemplated that payments would continue after 2006 and BellSouth has continued to enjoy the same benefits post-2006 as when it was previously making payments to the City pursuant to the 1906 Agreement and the 2001 Settlement Agreement.  Fifth, the City has no other remedy at law to seek compensation from BellSouth since the 2001 Settlement Agreement terminated the 1906 Agreement and the conditions for enactment of the Simplified Tax Legislation and the LMA Agreement have failed.

(125)

Damages for unjust enrichment are calculated as follows, "[t]he amount of compensation due is measured by the extent to which one has been enriched or the other has been impoverished, whichever is less.  The extent of the enrichment or impoverishment is measured as of the time the suit is brought or, according to the circumstances, as of the time the judgment is rendered."  La. Civ. Code art. 2298.

(126)

The Court finds that one method for measuring the amounts owed for the unjust enrichment in the present matter is the percentage method used in the 1906 Agreement. Since such a method is linked to the profits of the City, it more accurately reflects the value of the benefit or enrichment BellSouth has received.

(127)

However, the implementation of this percentage method poses challenges. The Court recognizes in its "Findings of Fact" that the parties have long disputed which revenues of BellSouth were subject to the three-percent compensation required by the 1906 Agreement. Furthermore, it is unclear exactly when the three percent payments were no longer taken from BellSouth's telephone rental revenues and instead were taken from revenues from certain local telephone service. *See supra* (31). Moreover, the evidence presented at trial indicated that BellSouth's revenues which may be susceptible to the three-percent likely have changed since 2000, when the final payments were made under the 1906 Agreement, as a result of the effect of Hurricane Katrina on BellSouth's business. These issues pose challenges to extrapolating figures from the past to calculate the compensation owed by BellSouth to the City for its unjust enrichment post-2006.

**Damages**

(128)

Because the evidence presented at trial does not enable the Court to adequately calculate the compensation owed by BellSouth to the City under the doctrine of unjust enrichment, the parties are directed to file memoranda regarding those revenues of BellSouth which should be subject to the three-percent compensation originating from the 1906 Agreement, the document

the Court selected for guidance as to the appropriate measure of damages.  The memoranda are to be filed with the Court by December 13, 2010.  Thereafter, an evidentiary hearing may be held if the parties and the Court determine such to be appropriate.  These Findings of Fact & Conclusions of Law aspire to resolve a majority of the issues which have been plaguing the litigants over the last one-hundred plus years.  Unfortunately, this one issue is outstanding and remains as a grain of sand in the litigants' respective eyes.  Hopefully, the briefing, and if necessary, the hearing, will remove this last remaining irritant and allow the parties to focus on more productive pursuits.

(129)

Interest on an unjust enrichment award does not begin to run until the date of the judgment.  *Beiber-Guillory v. Aswell*, 1998-559 (La. App. 3 Cir. 12/30/98); 723 So. 2d 1145 (citing *Dixie Mach. v. Gulf States Marine Tech.*, 96-869 (La. App. 5 Cir. 3/12/97); 692 So. 2d 1167).  Thus, the City is entitled to interest at the legal rate from entry of the Court's judgment.

(130)

It is well-settled under Louisiana law that attorneys' fees are generally not recoverable absent a statute or contract which provides otherwise.  *Quality Design & Const., Inc. v. City of Gonzales*, 2006-2211 (La. App. 1 Cir. 11/28/07); 977 So. 2d 87, 91(citing *Tassin v. Golden Rule Ins. Co.*, 94-0362 (La. App. 1 Cir. 12/22/94), 649 So. 2d 1050, 1058).  There exists no statute or contract in the present case that would warrant an award of attorneys' fees to the City, thus no fees are awarded.

37

## CONCLUSION

(131)

The Court finds that for the present and immediate future, unjust enrichment is the most appropriate method for BellSouth to compensate the City for the benefits it has been receiving since 2006.  It is unfortunate that this controversy cannot be resolved once and for all through a different method, especially because the parties intend to continue their business relationship beyond this case.  Future storms may occur, the economy may decline further or rebound, the telecommunications industry is likely to grow and broaden, and technology will advance. Depending on the variable doctrine of unjust enrichment to define long term compensation is less than satisfactory for both parties.  It lacks the definitiveness and certainty that is necessary for budgetary and planning purposes.  The Court urges the parties to take into consideration these concerns and all others in an effort to resolve their longstanding disputes on a contractual basis once and for all time.

New Orleans, Louisiana, this 12th day of November, 2010.

_____
U.S. DISTRICT JUDGE